## APPEAL OF YOUNKER BROTHERS, INC.

Docket No. 5522.    Promulgated September 27, 1927.

1. In view of the evidence in this proceeding it is held that Commissioner David H. Blair was not precluded from making a determination in respect of petitioner's tax liability for certain

periods in 1917 and 1918 which his predecessor, Commissioner William M. Williams, had considered, and as a result assessed an additional tax.

2. Petitioner, a New York corporation, acquired the tangible and· intangible assets of an Iowa corporation of the same name as a result of a reorganization and change of ownership after March 3, 1917, and may not, in computing invested capital for subsequent taxable periods include such assets therein at a greater value than could have been used with respect thereto in determining the invested capital of the predecessor corporation.

3. A portion of cash *bona fide* paid into a corporation for stock and subsequently borrowed by the stockholders from such corporation, should not, when it appears that the corporation had a *bona fide* account receivable and that the stockholders were fully solvent, have been excluded in computing the invested capital of such corporation.

4. The Commissioner correctly reduced invested capital of petitioner and its affiliated corporations on account of the tax due upon their incomes for the preceding taxable years.

*J. S. Y. Ivins, Esq.,* and *O. R. Folsom-Jones, Esq.,* for the petitioner.

*John D. Foley, Esq.,* for the Commissioner.

The Commissioner determined an overassessment of $1,550.48 for the period March 19, 1917, to December 31, 1917, resulting from a partial reduction of assessments of additional tax in excess of amounts shown upon the original return, in connection with a portion of which additional assessments the petitioner had filed an abatement claim. He also determined deficiencies in income and profits tax in the amounts of $25,893.47 and $21,655.47 for the calendar years 1918 and 1919, respectively, as a result of an investigation of the books and records of the petitioner and its affiliated corporations completed February 20, 1923, and an audit of the consolidated income and profits-tax returns filed by petitioner and five other affiliated corporations.

Petitioner claims that although it was not incorporated and chartered until March 19, 1917, it acquired the assets and business of a predecessor corporation prior to March 3, 1917, i. e., January 15, 1917, and that if it should be held that it acquired the property and business in question as a result of reorganization or ownership after March 3, 1917, within the meaning of section 208 of the Revenue Act of 1917 and section 331 of the Revenue Act of 1918, it acquired such property and business from a joint-stock association organized on January 15, 1917, and it is entitled therefore to value the tangible and intangible assets taken over by it at the actual cash value for invested capital purposes at the date it is alleged such assets were acquired by the association.

Upon the theory that it is correct in this claim, petitioner further claims that " the actual value of the tangible assets transferred upon reorganization in 1917 was $500,000; the actual value of the leasehold estates transferred at that time was $50,000; and the value of the good will of the Iowa corporation transferred at that time was $250,000," and, further, that " the preferred stock of the New York corporation was paid for in tangible assets of $500,000 of the Iowa corporation, and the new common stock was paid for by leasehold estates of $50,000, together with good will of $250,000 of the Iowa corporation."

A valuation of the tangible and intangible assets becomes necessary only in the event that it is held that petitioner acquired the property and business of the Iowa corporation as a result of a reorganization or change of ownership prior to March 3, 1917, or that it acquired such property and business from a joint stock association organized on January 15, 1917.

In addition to the above claims petitioner alleges that the Commissioner erroneously excluded from invested capital certain alleged accounts receivable of the Younker Brothers Building Co. and the Younker Realty Co., affiliated corporations, for the taxable periods involved, and in reducing invested capital for the taxable periods on account of tax upon income for the preceding years 1916, 1917, and 1918. Finally, petitioner claims that on December 21, 1920, the Commissioner then in office audited its returns for the fiscal years ending January 31, 1917, and January 31, 1918, and that the present Commissioner was without legal authority to determine any additional tax for the periods covered in the prior Commissioner's determination.

### FINDINGS OF FACT.

Younker Brothers, Inc., an Iowa corporation, hereinafter referred to as the Iowa corporation, was organized in 1904, taking over the department store business that had theretofore been carried on by a partnership in the City of Des Moines. At the end of 1916 it had outstanding 3,735 shares of common capital stock of the par value of $100 a share, or $373,500 par value, of which 3,360 shares were Class "A" stock with full voting rights and 375 were Class "C" stock which had no vote.

During December, 1916, the stockholders, some of whom also constituted the officers of the Iowa corporation, believing that its capitalization was disproportionate to its net worth, with the result that the book value of the stock was too large for trading purposes, and feeling that the company's employees should be enabled to acquire a stock interest in the corporation, considered the matter of increasing

the capitalization of the corporation. Before taking any action in the matter counsel was employed and several conferences were had with him at which all of the stockholders of the Iowa corporation were present either in person or by attorney in fact, at which the matter of reorganizing or reincorporating was discussed at length. After consideration counsel recommended that instead of increasing the capitalization of Younker Brothers, Inc., the Iowa corporation, a new corporation be organized under the laws of the State of New York to take over all of the property and business of the Iowa corporation, because of the more liberal corporation laws of New York and the saving which would be effected in the matter of local taxes. The stockholders of the Iowa corporation thought well of this suggestion and shortly before January 15, 1917, decided upon the plan of reorganization to be effected as quickly as possible.

By reason of the time which would necessarily be required to prepare articles of incorporation, secure a charter, have engraved certificates of stock of the New York corporation, and organize the same to take over the property and business of the Iowa corporation, an agreement prepared by the attorney for the reorganization of the Iowa corporation was executed by five individuals constituting the owners of all of its voting stock. A sixth individual, who owned 75 shares of Class " C " nonvoting common stock, did not sign the plan and agreement of reorganization but had theretofore specifically consented thereto in writing.

The reorganization agreement follows:

PLAN AND AGREEMENT FOR REORGANIZATION OF YOUNKER BROTHERS, INC.

The undersigned, HERMAN YOUNKER, of New York, New York, AARON YOUNKER, of Chicago, Illinois, IRA M. YOUNKER, of New York, New York, NORMAN M. WILCHINSKI and JOSEPH S. ZWART, both of Des Moines, Iowa, hereby agree with and represent to each other as follows:

*Iowa Corporation; Present Issue of Stock.*

1. Younker Brothers, Incorporated, is an Iowa corporation with capital stock represented by shares of the par value of $100 each, as follows:

|  | Authorized | Issued and outstanding |
|---|---|---|
| Common stock—Class A | $400,000 | $366,000 |
| Common stock—Class C | 50,000 | 7,500 |
| Preferred stock | 150,000 | None. |
|  | 600,000 | 373,500 |

The 3,660 outstanding shares of common stock, Class A, of the prior value of $366,000, are owned by the undersigned in the following proportions:

|                       | Shares |
|-----------------------|--------|
| Herman Younker        | 680    |
| Aaron Younker         | 890    |
| Ira M. Younker        | 550    |
| Norman M. Wilchinski  | 1,040  |
| Joseph S. Zwart       | 500    |

making the amount, as above, of 3,660 shares.

The 75 outstanding shares of common stock, Class C, of the par value of $7,500, are owned by A. E. Fletcher of Des Moines, Iowa, whose consent to this plan has been given.

The shares of Fletcher are, for the purposes hereinafter stated, to be treated as on a parity with shares of Class A.

*Incorporation of " Younker Brothers, Inc.", New York Corporation.*

2. A corporation is to be organized under the laws of the State of New York with the corporate name of " Younker Brothers, Inc.", which will carry on business with a capital of $550,000, represented by 5,000 shares of preferred stock of the par value of $100 each, amounting to $500,000 and 10,000 shares of common stock without any nominal or par value.

*Issue of Stock of New York Corporation.*

3. The shares of the New York corporation are to be issued to the present stockholders of record as follows:

| Stockholder | Shares in Iowa corporation | Shares of preferred stock of New York corporation | Shares of common stock of New York corporation |
|-------------|---------------------------|--------------------------------------------------|------------------------------------------------|
| Herman Younker        | 680   | 910.3   | 1,820.65  |
| Aaron Younker         | 890   | 1,191.5 | 2,382.85  |
| Ira M. Younker        | 550   | 736.3   | 1,472.55  |
| Norman M. Wilchinski  | 1,040 | 1,392.2 | 2,784.45  |
| Joseph S. Zwart       | 500   | 669.3   | 1,338.65  |
| A. E. Fletcher        | 75    | 100.4   | 200.85    |
| Total                 | 3,735 | 5,000.0 | 10,000.00 |

provided, however, that no fractional shares shall be issued, and the undersigned shall sell their fractional rights to each other upon a basis of $100 for each share of preferred stock and $30 for each share of common stock, as the Company's counsel may specify.

*Allotment of Shares to Employes.*

4. To further the interests of the New York corporation and to furnish shares of stock to be sold to its employes, the undersigned agree that, upon the call of Herman Younker, Aaron Younker, Ira M. Younker and Norman M. Wilchinski, there shall be released to them by the undersigned, for the sale thereof, a total of not to exceed 650 shares of the preferred stock and 2,000 shares of

the common stock, to which the undersigned shall contribute the shares set opposite their respective names, or such part thereof as may be called:

| Stockholder | Shares of preferred stock | Shares of common stock |
|---|---|---|
| Herman Younker | | 431 |
| Aaron Younker | | 563 |
| Ira M. Younker | 200 | 348 |
| Norman M. Wilchinski | 200 | 658 |
| Joseph S. Zwart | 250 | |

making the total of 650 shares of preferred and 2,000 shares of common stock; provided that, if, at the time of any such call, stock certificates of the New York corporation have not been issued and delivered to the parties last above mentioned, they may be called upon to deposit, in lieu thereof, certificates representing an equivalent number of shares of the Iowa corporation, upon the basis set forth in paragraph 3 hereof, but such shares of the Iowa corporation shall not be sold and said certificates shall be held by said Herman Younker, Aaron Younker, Ira M. Younker and Norman M. Wilchinski, (or such one of them as they may designate for the purpose) to secure them against the issuance by them of Interim Certificates for an equivalent number of shares of the New York corporation.

The sales to employes shall be made, for the benefit of the persons contributing the shares, by Herman Younker, Aaron Younker, Ira M. Younker and Norman M. Wilchinski to such employes as may be selected by them, at a uniform price of $100 per share of preferred stock and $30 per share of common stock, and upon such other terms as a majority of them may determine, excepting that the 250 shares of preferred stock contributed by said Zwart shall be sold only for cash unless he shall expressly, in writing, permit a sale thereof upon other terms.

Such sales may be made at any time and from time to time, until the foregoing allotment of common and preferred stock has been exhausted, and, pending the issue of stock certificates of the New York corporation, Herman Younker, Aaron Younker, Ira M. Younker and Norman M. Wilchinski may issue Interim Certificates to the purchasers in the form hereto attached.

The proceeds of sale shall be held in a separate account for the joint benefit of the persons contributing the shares sold, as their respective interests therein may appear, until the surrender, from time to time, of the certificates representing such shares of the New York corporation and thereupon the person surrendering such certificate shall be paid the proportionate part of the proceeds.

*Transfers as of January 15, 1917.*

5. All transfers from the Iowa corporation to the New York corporation, and all transactions between the two corporations, and all dealings that may be had between any of the undersigned or any other corporation in which any of them are interested with respect to the property of either the Iowa or New York corporations, shall, for purposes of accounting, be deemed effected as of January 15, 1917, irrespective of the actual date of consummation.

*Amount of Capital—$550,000.*

6. The Iowa corporation shall transfer all its assets to the New York corporation or to such trust company, persons or person, for the benefit of the

New York corporation (whether or not then organized), as the Company's counsel may designate. The actual value of such assets, over and above all liabilities and good-will, shall be $550,000, of which $500,000 shall consist of cash on hand and in bank, merchandise, fixtures, bills and accounts receivable and other items of the same character as are included in the assets of the Iowa corporation, as more fully appears from its statement of assets and liabilities of January 15, 1916, on page 92 of its corporate record book; and the other $50,000 shall be represented by the leasehold estates of the Iowa corporation (of which the New York corporation shall become vested) created by (a) the lease from Younker Brothers Construction Company, Incorporated, to the Iowa corporation, dated January 1, 1910, for a term from January 1, 1910 to April 1, 1924, relating to the premises at Seventh and Walnut Streets in Des Moines, Iowa now occupied by the Iowa corporation as its principal place of business and also by (b) the two leases dated April 10, 1916 for the term beginning March 1, 1916 and ending April 1, 1924, to the Iowa corporation, as lessee, in one of which, relating to lots five and six in block six of West Fort Des Moines, forming a part of the city of Des Moines, Younker Building Company is lessor, and in the other of which, relating to lots seven and eight in said block six, Younker Realty Company is lessor.

### Dissolution of Iowa Corporation.

7. The Iowa corporation shall be dissolved as soon as the Company's counsel deems it advisable.

### Directors and Officers.

8. The directors of the New York corporation for the first year shall be the following (and no more) and each shall be elected for the first year to the office set opposite his name :

| | |
|---|---|
| Herman Younker | President |
| Aaron Younker | First Vice-President |
| Norman M. Wilchinski | First Vice-President |
| Joseph S. Zwart | Second Vice-President |
| Ira M. Younker | Secretary |
| Norman M. Wilchinski | Treasurer. |

### By-Laws.

9. The by-laws shall contain the following provisions:

(a) Neither the President, the Vice-Presidents, the Secretary, the Treasurer nor any of the directors shall be entitled to a salary as such, but any such person may be elected by the directors as an officer in the management of the company's business (such as general manager, assistant manager, etc.) and receive a salary therefor, to be fixed by the Board of Directors.

(b) Checks or other orders for the payment of the corporate funds shall be valid when signed by any one of the officers, and notes or other obligations shall be valid when signed by one of said officers and countersigned by another, but one person holding two offices shall not both sign and countersign.

(c) The Articles of Incorporation shall contain no restrictions upon the power to make or the provisions of the by-laws, except a general restriction that no by-laws shall be valid if inconsistent with the articles. Subject to this restriction of the Articles of Incorporation and the statutory right of the stockholders to adopt, alter and amend by-laws, the Board of Directors shall, by a vote of four-fifths, make the by-laws.

The first set of by-laws shall contain the foregoing and such other provisions not inconsistent herewith as may be agreed upon by four-fifths of the undersigned.

*Provisions relating to Common and Preferred Stock.*

10. In the certificate of incorporation of the New York corporation, the following provisions shall be made relating to the preferred and common stock:

(*a*) Holders of preferred stock shall be entitled to cumulative dividends at the rate of 7% per annum and no more, payable semi-annually, on the fifteenth day of January and July of each year, or on such other dates as may be fixed from time to time by the by-laws, and all unpaid accumulated dividends shall bear interest at the rate of 6% per annum, payable semi-annually.

(*b*) After the payment of all dividends on the preferred stock, there shall be set apart in each year, beginning January 15, 1919, out of the surplus and net profits of the corporation in such year, the sum of $10,000, as a fund for the retirement by lot in each year, beginning January 15, 1920, of 100 shares of the preferred stock at the par value thereof, until all of the preferred stock shall have been retired.

(*c*) After paying or setting apart sums for the payment of the dividends on the preferred stock and the annual specified reservation for the retirement of the preferred stock, the Board of Directors may declare dividends on the common stock out of any remaining surplus and net profits.

(*d*) The preferred stock shall be subject to redemption at any time after January 15, 1920, in whole or in part (and in the latter case, by lot) at $110 for each share, plus all unpaid accumulated dividends together with 6% interest and the accrued dividend thereon, upon not less than 60 days' notice mailed to the record holders thereof.

(*e*) The holders of preferred stock shall not be entitled to any vote unless dividends upon such stock are in arrears to the extent of 14% of the par value thereof and thereupon they shall be entitled to vote upon all questions and at all meetings of stockholders, in the same manner as the holders of common stock, and such voting rights shall continue until all dividends in arrears and the interest thereon have been paid.

The holders of the common stock shall be entitled at all meetings of stockholders to one vote for each share of common stock owned by them.

(*f*) So long as any of the preferred stock is outstanding, no stock entitling the holder to any preference over it shall be issued and no mortgage or similar lien (except purchase money mortgages or mortgages to which property at the time of purchase or acquisition may be subject) shall be placed upon the property of the corporation except with the consent of the holders of shares representing three-fourths in amount of the outstanding preferred stock.

(*g*) Upon any dissolution or liquidation of the corporation or in the event of its insolvency or upon any distribution of capital assets, whether voluntary or involuntary, there shall be paid to the holders of the preferred stock 110% of the par value thereof and all unpaid accumulated dividends thereon, together with 6% interest and the accrued dividend thereon, and after making such payment to the holders of the preferred stock, all the remaining net assets of the corporation shall be *divided* among and paid to the holders of the common stock ratably, according to their respective shares.

It is further agreed that the Astor Trust Company of New York shall act as transfer agent and no permanent stock certificates shall be valid unless countersigned by it.

*Further Assurances.*

11. The undersigned agree, as individuals and in any representative capacity and as officers, directors and stockholders of the Iowa corporation (as the case may be) to do any acts and execute any instruments that may be necessary or, by the Company's counsel, deemed desirable, to carry into effect the purposes of this plan and agreement.

*Organization Expense.*

12. All expenses incurred in or arising out of the reorganization of the business of the Iowa corporation and the incorporation of the New York corporation shall be charged as organization expenses against the New York corporation, or if the latter is not formed, shall be borne by the Iowa corporation.

*Representations to the Subscribers.*

13. No representations of any kind have been made, either by or on behalf of the Iowa corporation, the New York corporation or the undersigned, or any of them, to any of the parties hereto, except as herein expressly stated.

*Construction of this Agreement.*

14. The Company's counsel, herein referred to, is Leo F. Wormser, of Chicago, and, in the event of any question or controversy as to the construction or interpretation of any of the provisions of this plan and agreement, his decision shall be binding upon all the parties.

15. This agreement shall be binding upon and inure to the benefit of (as the case may be) not only the parties hereto, but also their respective heirs, legal representatives and assigns, as fully as if in each case expressly so provided.

IN WITNESS WHEREOF, the Undersigned, as the parties hereto, have hereunto set their hands and seals as of January 15, 1917.

(This instrument is executed in five counterparts, each of which is and shall be deemed an original thereof.)

| | |
|---|---|
| AARON YOUNKER | (SEAL) |
| HERMAN YOUNKER, by | |
| IRA M. YOUNKER his | |
| attorney in fact | (SEAL) |
| IRA M. YOUNKER | (SEAL) |
| NORMAN M. WILCHINSKI | (SEAL) |
| JOSEPH S. ZWART | (SEAL) |

While the above-quoted plan and agreement for reorganization of the Iowa corporation was being prepared counsel also prepared and had printed preferred and common interim certificates to be issued to and held by the stockholders of the Iowa corporation pending the incorporation and organization of Younker Brothers, Inc., a New York corporation. These interim certificates were printed and delivered at Des Moines on January 12, 1917. They were as follows:

YOUNKER BROTHERS, INC.

New York Corporation

| Preferred Stock 5,000 shares | Common Stock 10,000 shares |
| $500,000 par value | without par value |

INTERIM CERTIFICATE

THIS IS TO CERTIFY that ―― ―― is entitled to receive ―― shares, of the common stock, without any nominal or par value, of Younker Brothers, Inc. (a corporation to be organized under the laws of the State of New York, with five thousand shares of preferred stock of the aggregate par value of $500,000 and ten thousand shares of common stock which shall have no nominal or par value, for the purpose of acquiring the assets and business of Younker Brothers, Incorporated, an Iowa corporation), for which shares a stock certificate, or certificates, if, as and when issued, shall be delivered by the undersigned to the holder hereof, upon the surrender of this certificate.

In the event that said New York corporation is not incorporated or does not acquire the business and assets of the Iowa corporation, the undersigned shall, upon the surrender hereof, repay to the holder hereof all sums and return all notes or other forms of indebtedness which may have been received by the undersigned upon the original delivery of this certificate, together with interest upon such sums at 5% per annum from the date hereof, and thereby the undersigned shall be fully discharged of all liability hereunder, or otherwise.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this ―― day of ――, 1917.

(Not valid unless signed in person by one of the undersigned on their behalf.)

HERMAN YOUNKER
IRA M. YOUNKER
AARON YOUNKER
NORMAN M. WILCHINSKI

By ―― ――

On their behalf.

The preferred interim certificates contained the same provisions except that they evidenced a right of the holder to receive a certain number of shares of preferred stock of Younker Brothers, Inc., a New York corporation, if, as and when issued. The stockholders of the Iowa corporation prior to the execution of the plan and agreement for reorganization had agreed to pool certain of their stock interests so that certificates could be issued to certain selected employees of the Iowa corporation. Between January 15 and January 17, 1917, all of the stockholders of the Iowa corporation delivered their stock to the attorney handling the reorganization, who has since held such stock in his possession. Thereupon these stockholders received, ratably to their stock interests in the Iowa corporation, preferred and common interim certificates, except as to certain of their stock interests which had been set aside for employees for which interim certificates were thereafter and prior to March 3, 1917, issued

to a number of employees of the Iowa corporation evidencing the right of the several employees to receive a total of 3,600 shares of preferred and common stock of the New York corporation if organized, upon their paying or contracting to pay $100 a share for preferred and $30 a share for common stock as shown by the interim certificates. Younker Brothers, Inc., the Iowa corporation, was not dissolved and the stock certificates delivered by the stockholders to their attorney for the interim certificates were not canceled. The business of the corporation was carried on as before. The books of the Iowa corporation were closed on January 15, 1917, and new books of the New York corporation were opened on January 15, 1917. On March 7, 1917, Herman Younker, Aaron Younker, Ira M. Younker, Norman M. Wilchinski and Joseph S. Zwart signed and acknowledged the following:

CERTIFICATE OF INCORPORATION OF YOUNKER BROTHERS, INC.

We, the undersigned, all being persons of full age and at least two-thirds of us being citizens of the United States and at least one of us being a resident of the State of New York, desiring to form a stock corporation pursuant to the provisions of the Business Corporations Law and to the provisions of sections 19, 20, 21, 22 and 23 of the Stock Corporation Law as amended by chapter 351 of the laws of 1912, of the State of New York, do hereby make, sign, acknowledge and file this certificate for that purpose as follows:

FIRST: The name of the proposed corporation is Younker Brothers, Inc.

SECOND: The objects for which the Corporation is established are:

To establish, conduct and carry on, in all its branches, (both within and outside of the State of New York) a general merchandise business and department store and in connection therewith to carry on all or any of the trades, businesses, undertakings or functions that in any manner are subsidiary, incidental and contributory thereto;

To acquire and take over, as a going concern, the general merchandise business now carried on at Des Moines, Iowa, by Younker Brothers, Incorporated, and all or any of the assets or liabilities of that business; * * *

THIRD: The number of shares that may be issued by the Corporation is fifteen thousand (15,000), of which five thousand (5,000) shares of the amount and par value of One hundred dollars ($100) each are to be preferred stock, and ten thousand (10,000) shares are to be common stock without any nominal or par value.

FOURTH: The holders of the preferred stock shall be entitled to cumulative dividends thereon at the rate of seven per cent. (7%) per annum and no more, payable out of any and all surplus and net profits, semiannually, on the first day of February and of August of each year, or on such other dates as may be fixed from time to time by the By-Laws; and the same shall be paid or set apart before the Special Surplus Fund hereinafter provided for shall be set aside and before any dividends shall be declared, set apart for, or paid upon the common stock of the Corporation. Said dividends on the preferred stock shall be cumulative and all unpaid accumulated dividends shall bear interest at the rate of six per cent. (6%) per annum, so that if the Corporation shall fail at any time to pay, in full, the accrued dividends on all of the issued and outstanding preferred stock, such deficiency in the dividends with interest thereon

at six per cent. (6%) per annum, together with any accrued dividend, shall thereafter be fully paid before said Special Surplus Fund shall be set apart and before any dividends shall be paid or set apart on the common stock. Subject to the foregoing provisions and subject to the provisions hereinafter set forth with reference to the redemption of the preferred stock, the said preferred stock shall not be entitled to participate in any other or additional earnings or profits of the Corporation.

Commencing with the year, 1919, and continuing until all of the outstanding preferred stock of the Corporation shall have been redeemed or retired, the Corporation shall set aside in each year from the surplus and net profits remaining after the aforesaid dividends on the preferred stock and any interest thereon have been paid or set apart for payment, and before any dividends shall be declared on or set apart for the common stock, a Special Surplus Fund of an amount sufficient to retire one hundred (100) shares of preferred stock, on the terms hereinafter provided. The obligation to set aside the aforesaid Special Surplus Fund shall be cumulative, so that if, in any year, said remaining surplus profits shall be insufficient to permit the full amount required as aforesaid to be set aside, or if, for any reason, such full amount shall not be set aside, the deficiency shall be made up out of the surplus profits of the succeeding fiscal year or years before any dividends shall be declared or paid upon the common stock; and whenever, in any year, but not until, all the aforesaid dividends on the preferred stock, together with any interest thereon, shall have been duly set aside or paid and the aforesaid Special Surplus Fund shall have been set aside in full, as herein provided, the Board of Directors, in their discretion, may, out of the remaining surplus or net profits, declare dividends upon the common stock.

On February 1, 1920, and each year thereafter, the aforesaid Special Surplus Fund shall be applied in full to the retirement in each such year of a total of one hundred (100) shares of the preferred stock, at the par value thereof; and the shares which shall constitute the aggregate one hundred shares of preferred stock to be retired in each year as aforesaid shall be ascertained by lot, without preference or discrimination, in such manner as the Board of Directors may determine; provided, however, that in the event that the Corporation shall have the opportunity to purchase any such stock at less than the par value thereof, such preferred stock may, from time to time, be purchased and retired by the Corporation in preference to any other, and the purchase and retirement in any one year of one hundred shares shall warrant the directors in withdrawing from said Special Surplus Fund any remaining balance resulting from the purchase of such stock at less than the par value thereof, which balance may be transferred to the surplus or net profits of the Corporation, or otherwise disposed of, as the Board of Directors shall deem best. Moneys credited to the Special Surplus Fund and not for the time being used for the purchase or retirement of the preferred stock shall not be required to be withdrawn from the business, provided, however, that the same must be kept available for the purchase or retirement of the preferred stock as above provided. Preferred stock purchased or redeemed by the Corporation shall be retired and shall not be reissued.

The whole of the outstanding preferred stock, or any part thereof, shall be subject to redemption, subject to the conditions hereinafter contained, at any dividend date after February 1, 1920, by paying in cash for each share of the preferred stock to be redeemed One hundred and ten dollars ($110), plus all unpaid accumulated dividends, together with six per cent. (6%) interest thereon, and the accrued dividend; provided, however, that in the event that only a

part of the preferred stock is so redeemed, the number of such shares demanded or accepted for redemption from each shareholder of the preferred stock shall be as nearly in proportion to the relative number of shares of preferred stock held by each such stockholder as that relation can be expressed in whole numbers in the terms of the number of shares retired.

Sixty (60) days' previous notice of the intention to redeem or retire any preferred stock shall be given to the holders of record of the stock demanded, by registered mail (postage prepaid), addressed to said holders at their respective places of residence, as shown by the stock register books of the Corporation. If such notice has been duly given, and if, on or before the date named in said notice, the funds necessary for such retirement or redemption shall have been set aside and shall continue available therefor, then, notwithstanding that any certificate or certificates for the preferred stock shall not have been surrendered for cancellation, the right of the holders of such stock so called for retirement or redemption to receive dividends thereon shall cease on said date and such stock shall not thereafter be transferable on the books of the Corporation, except to the Corporation; and thereafter the holders of such stock shall have no rights in or in respect to the Corporation, its assets or its business, other than the right to receive the stipulated price plus any unpaid accumulated dividends, together with interest thereon at the rate of six per cent. (6%) per annum and the accrued dividend, all determined as of the date fixed for such redemption or retirement, without interest thereafter, upon the surrender of the certificate or certificates for such stock.

In the event of the dissolution or liquidation or winding up of the Corporation, or in the event of its insolvency or upon any distribution of capital, there shall be paid to the holders of the preferred stock One hundred and ten dollars ($110) for each share thereof; provided, however, that if any such event shall be involuntary and it shall be contrary to law that the preferred stock, or any part thereof, shall have a preference as to principal in excess of the par value of the shares thereof, then there shall be paid to the holders of the preferred stock One Hundred dollars ($100), and no more, for each share thereof; and in any event, whether voluntary or involuntary, all accumulated dividends, with interest thereon at six per cent. (6%) per annum, and the accrued dividend, before any sum shall be paid to or any assets distributed among the holders of the common stock; and after making said payment to the holders of the preferred stock, all of the remaining assets and funds of the Corporation shall be divided among and paid to the holders of the common stock ratably, according to their respective holdings, without preference or priority.

So long as any preferred stock shall be outstanding, the preferred stock by this certificate authorized shall not be increased, and no stock entitling the holder to any preference over it shall be issued, and no mortgage, lien or encumbrance of any kind, upon any part of the real or personal property, assets, effects, stocks, bonds, securities, undertakings or good-will of the Corporation shall be created, and be valid or effective, unless the same shall have been previously approved by the holders of at least three-fourths in amount of the preferred stock then outstanding, given in person or by proxy, either in writing or at an annual meeting, or at a special meeting of the stockholders called for that purpose; but this prohibition shall not be deemed or construed to apply to, nor shall it operate to prevent, the Corporation giving purchase money mortgages, or other purchase money liens, on property to be hereafter acquired by the Corporation, or the pledging by the Corporation, as security for loans made to the Corporation in the regular and current conduct of its business, of merchandise, accounts, notes, bills receivable or other liquid assets.

The holders of the preferred stock shall not have the power or right to vote at any meeting of the Corporation, nor shall they, as such, be entitled to notice of any such meeting, except as otherwise expressly provided by law and except that (1) in the event of any default in the payment of dividends upon the preferred stock to the extent of ten and one-half per cent. (10½%) of the par value of said stock, and (2) in the event that the Corporation shall in any year fail or neglect to retire one hundred (100) shares of the preferred stock as hereinabove required, then, and in either of such events, and so often as any such event shall happen, the holders of the preferred stock shall be vested with full voting powers to the like extent as the common stock, that is to say, each share of the preferred stock shall be entitled to one vote and such voting power of the shareholders of the preferred stock shall continue, as the case may be, until (1) all dividends in arrears and the interest thereon shall have been fully paid and (2) a total of one hundred (100) shares of the preferred stock shall have been retired, to apply in respect to the year in which such default has occurred; and thereafter the holders of the preferred stock shall not be entitled to vote.

Except as otherwise expressly required by law and except as herein expressly provided, the right to vote at meetings of stockholders upon any question and to give consent in any statutory proceedings requiring the consent of stockholders shall be vested exclusively in the common stock and at all meetings of stockholders, each share of common stock shall be entitled to one vote.

FIFTH: The amount of capital with which said Corporation will carry on business is Five hundred and fifty thousand dollars ($550,000).

\*        \*        \*        \*        \*        \*        \*

EIGHTH: The principal business office of this Corporation is to be located in the Village of Milbrook, in the Township of Washington, in the County of Dutchess and State of New York.

\*        \*        \*        \*        \*        \*        \*

FOURTEENTH: The names and postoffice addresses of the Directors of the Corporation who shall hold office for the first year are:

| Names | Postoffice addresses |
|---|---|
| Herman Younker | 303 Fifth Avenue, New York City, New York |
| Aaron Younker | 16 North Michigan Avenue, Chicago, Illinois |
| Ira M. Younker | 303 Fifth Avenue, New York City, New York |
| Norman M. Wilchinski | % Younker Brothers, Inc., Des Moines, Iowa |
| Joseph S. Zwart | % Younker Brothers, Inc., Des Moines, Iowa |

FIFTEENTH: The names and post office addresses of the subscribers to this certificate and the number of shares of stock which each agrees to take in the Corporation are as follows:

| Names | Postoffice addresses | Number of shares |
|---|---|---|
| Herman Younker | 303 Fifth Avenue, New York City, New York | 1 preferred, 1 common. |
| Aaron Younker | 16 North Michigan Avenue, Chicago, Illinois | 1 preferred, 1 common. |
| Ira M. Younker | 303 Fifth Avenue, New York City, New York | 1 preferred, 1 common. |
| Norman M. Wilchinski | c/o Younker Brothers, Inc., Des Moines, Iowa | 1 preferred, 1 common. |
| Joseph S. Zwart | ____do | 1 preferred, 1 common. |

SIXTEENTH: The Corporation may issue and may sell its authorized shares of the common and preferred stock, from time to time, for such consideration as, from time to time, may be fixed by the Board of Directors, and any and all shares so issued shall be deemed fully paid and non-assessable and the holder of such shares shall not be liable to the Corporation or to its creditors in respect thereof.

IN WITNESS WHEREOF, we have made, signed and acknowledged this certificate, this seventh day of March, 1917.

|                |                    |
| -------------- | ------------------ |
| Herman Younker | Ira M. Younker     |
| Aaron Younker  | Norman M. Wilchinski |
|                | Joseph S. Zwart.   |

The original of this certificate of incorporation bears the following endorsement: " Certificate of incorporation of Younker Brothers, Inc. Tax for privilege of organization of this corporation, $750, under section 180, chapter 62, Laws of 1909, as amended. Paid to State Treasurer before Filing. State of New York. Office of Secretary of State. FILED and RECORDED, March 19, 1917. Francis M. Hugo, Secretary of State."

On or shortly after March 19, 1917, Younker Brothers, Inc., a New York corporation, took over the property and business of Younker Brothers, Inc., an Iowa corporation, and issued its stock to the holders of the interim certificates hereinbefore quoted in the amounts specified therein. The interim certificates were surrendered to and have since been held by the attorney who represented the stockholders of the Iowa corporation in the preparation of the plan and agreement for reorganization and in the incorporation and organization of the New York corporation.

The first dividend declared by the New York corporation on its preferred stock was computed upon the earnings of the business of Younker Brothers, Inc., from January 15 to July 15, 1917, and was paid on August 1. Similarly, the first dividend of the New York corporation on its common stock was computed on earnings of the business from January 15, 1917, to January 15, 1918, and was paid on February 1, 1918. These distributions were made in accordance with the holdings of interim certificates from on or about January 15, 1917, to March 19, 1917, and subsequently of the stock of the New York corporation.

On or shortly after March 27, 1918, Younker Brothers, Inc., executed and filed a corporation income-tax return, Form 1031, signed and sworn to by N. M. Wilchinski, vice president, and Joseph S. Zwart, treasurer. There appeared upon the face of this reurn the following:

CORPORATION INCOME TAX RETURN.

Return of annual net income for the fiscal year ended *January 15, 1918.*

| | |
| --- | --- |
| Name of corporation | *Younker Brothers, Inc.* |
| Prinicipal office | *Des Moines, Iowa.* |
| Kind of business carried on | *Mercantile Department Store.* Date of organization *January 15, 1917.* |

This return showed the total gross income as $2,608,040.66; total deductions as $2,445,954.44, and the total net income as $162,086.22, and a total income and excess-profits tax of $32,120.84.

On or about the same date Younker Brothers, Inc., executed and filed a corporation excess-profits-tax return, Form 1103, signed and sworn to by the same officers who had executed the income-tax return. There appears upon the face of this return the following:

CORPORATION EXCESS PROFITS TAX RETURN.

Taxable year ended *January 15, 1918.*

Name                 *Younker Brothers, Inc.*
Business address     *7th & Walnut, Des Moines, Iowa.*
Kind of business     *Mercantile Department Store.*  Date established.
                     *January 15, 1917*

This was the return only of the net income and invested capital of Younker Brothers, Inc. This return showed the net income as $162,086.22; the prewar invested capital as $1,563,021.73, and excess-profits tax as $23,825.18. The following appears in Schedule " C 5 " on page 2 of this return:

Was the business reorganized or consolidated, or was its ownership changed after March 3, 1917? Answer. *No.*

Under Schedule " C 1 " of page 2 of this return there appears the following:

Is any good will, trade-mark, trade brand, franchise, or similar intangible property, paid in for stock, entered on the books of the corporation at a value in excess of its actual cash value when paid in? Answer. *No.*

Accompanying this Schedule " C 1 " there was attached to the return the following typewritten statement:

*Statement Accompanying Schedule C, Item 1.*
*Younker Brothers, Inc.*
*Excess Profits Tax Return for 1917.*

Good-will (a) was acquired January 15, 1917; (b) its cash value at that date was $250,000; (c) the stock issued therefor and for the excess of tangible property above par value of the preferred stock, i. e., $50,000, was stock without par value, represented by 10,000 shares; (d) $500,000 preferred stock and 10,000 shares common stock without par value; and (e) the value at which good-will assets are entered on the books of the corporation is $250,000.

The amount by which " e " ($250,000) exceeds 20% of "d " ($160,000) is $90,000.

The total shares of stock measured by their values, etc., in accordance with Art. 58 of Regulations No. 41, was $800,000; 20% of this amount is $160,000. A–1 plus B–2 is $550,000; the total of $550,000 and $160,000 is $710,000. The amount by which " e " ($800,000) exceeds this total ($710,000) is $90,000, which constitutes Item 1 of schedule C for the taxable year.

On page 4 of this return under " Questions," there appear, among others the following questions and answers made thereto by the petitioner.

Date of incorporation. *January 15, 1917.*

Under the laws of what State or country? *New York, Charter filed March 19, 1917.*

If the corporation ever took over a going business or otherwise acquired a mixed aggregate of tangible property * * * and good will * * * and paid for such property in whole or in part with stock or other securities, submit a statement showing—

(*a*) The name of the concern taken over (or from which the property was acquired). *Younker Brothers, Inc. (Iowa Corporation).*

(*b*) The value at which each item was entered on the books of the corporation making this return. * * *. *All values are entered on books of this corporation as shown in this return. See statement accompanying C 1.*

Is the corporation affiliated with one or more other corporations within the meaning of Article 77 of the Excess Profits Tax Regulations? *No.*

Is this return a consolidated return within the meaning of Article 78 of the Excess Profits Tax Regulations? *No.*

On December 21, 1920, the following unsigned letter was mailed to the taxpayer:

A–2                                                          TREASURY DEPARTMENT,
Office of                                                *Washington, December 21, 1920.*
Commissioner of Internal Revenue
    Address Reply to
Commissioner of Internal Revenue
    and refer to
IT : SA : AS : G—10131
RHP–35732421
YOUNKER BROS. INC.,
    *Des Moines, Iowa.*

SIRS : You are informed that an audit of your income tax returns for the calendar years 1914 and 1915, the period of one month of January 1916 and the fiscal years ended January 31, 1917 and 1918, together with your profits tax returns for the latter two years indicates that you are subject to an additional tax of $6,360.83. This is based on Revenue Agents' reports dated July 20, 1918, July 22, 1918, and July 22, 1920, with revisions noted below for the fiscal year ended January 31, 1918:

Taxable net income for 1918, as adjusted by Revenue Agent_____ $171, 586. 22

Statutory invested capital for application of 1917 rates as computed by Revenue Agent_____ 718, 737. 55

Statutory invested capital for application of 1918, revised in this office, difference being due to increase in limitation of good will to 25%, and prorating of changes by days instead of months__ 755, 192. 16

Excess Profits credit for 1917 rates_____ 64, 686. 38
    "        "        "        " 1918 " _____ 60, 415. 37
War      "        "        " 1918 " _____ 152, 956. 52

Total tax at 1917 rates for 11 months_____ 32, 489. 07
    "        "        " 1918 "        " 1 month_____ 4, 664. 61

    Total tax assessable for full fiscal year_____ 37, 153. 68
Original tax assessed_____ 32, 120. 84

| | | |
|---|---|---|
| Additional tax, fiscal year Jan. 31, 1918_____ | $5, 032. 84 | |
| "    "    "    "    "    " 1917_____ | 652. 30 | |
| "    " Month of Jan. 1916_____ | 144. 62 | |
| "    " calendar year 1915_____ | 114. 20 | |
| "    "    "    " 1914_____ | 416. 87 | |
| Total additional tax_____ | 6, 360. 83 | |

With regard to the years in which no revision was found necessary, you are referred to synopsis of reports furnished you by Revenue Agent at close of investigation.

Inasmuch as the additional tax for 1914 was not discovered until after the expiration of the three year statutory limitation, formal assessment cannot be made without a waiver of such limitation. This tax may, however, be collected by suit, but in order to eliminate the necessity of collection by suit, you are requested to execute the enclosed blank form of waiver for 1914, returning same to this office at the earliest practicable date.

The Collector of Interval Revenue for your district will notify you, as to the time and manner of making payment of the above taxes.

Respectfully,

————  ————,
*Deputy Commissioner.*

Enclosure:
Waiver form.

The additional tax shown as for the fiscal years ending January 15, 1917, and January 15, 1918, was assessed and paid. On December 21, 1920, William M. Williams was Commissioner of Internal Revenue. On May 27, 1921, David H. Blair became Commissioner of Internal Revenue. On May 16, 1925, the Commissioner mailed the following letter to the taxpayer:

TREASURY DEPARTMENT,
WASHINGTON, *May 16, 1925.*

Office of
Commissioner of Internal Revenue
IT : CR : A
VHB
YOUNKER BROS., INCORPORATED,
*7th & Walnut Streets, Des Moines, Iowa.*

SIRS : An examination of the consolidated income and profits tax returns filed by you and your affiliated companies for the fiscal period March 19, 1917 to December 31, 1917, and the calendar years 1918 and 1919, based upon a Revenue Agent's Report dated February 20, 1923, has been made and the results thereof are outlined in the attached statement and schedules.

*        *        *        *        *        *        *

Respectfully,

D. H. BLAIR,
*Commissioner.*
By : J. G. BRIGHT,
*Deputy Commissioner.*

Enclosures:
Statements
Agreement—Form A.
Schedules 1 to 68.

The statement and schedules attached to this letter showing the details of the computation resulting in the deficiencies mentioned contain 40 pages and show that the Commissioner's determination was the result of an investigation of the books and records of petitioner and its affiliated companies completed February 20, 1923, and an audit of the income-tax return, Form 1031, filed by the petitioner and the five affiliated corporations as follows: Younker Bros. Construction Co., Younker Realty Co., Younker Building Co., Commercial Realty Co., and the Recknoy Realty Co., and the consolidated excess-profits-tax return of the several companies, Form 1103, filed for the period March 19, 1917, to December 31, 1917, and the consolidated income and excess-profits-tax returns, Form 1120, of these companies filed for the calendar years 1918 and 1919.

The Commissioner determined that the consolidated net income for excess-profits-tax purposes for the period in 1917 and the consolidated net income for 1918 and 1919 was in excess of the net income as determined by him for Younker Brothers, Inc., alone.

Prior to the mailing of the above-mentioned notice of May 16, 1925, and in March, 1923, the Commissioner made an assessment of an additional tax of $6,998.31 for the year ended December 31, 1917. Upon final determination the Commissioner, as set forth in the notice of May 16, 1925, applied the proper proportion of the tax previously assessed to the period March 19, 1917, to December 31, 1917, and determined that there had been an overassessment for this period of $1,550.48. He did the same for the calendar year 1918 and determined a deficiency of $25,893.47 and for the calendar year 1919 a deficiency of $21,655.44, and advised the petitioner that—

The above additional tax is based upon a Revenue Agent's report dated February 20, 1923, amended in certain particulars in accordance with agreements reached in conference, details of which will be found in attached schedules 1 to 68, inclusive.

You are advised that the Income Tax Unit holds on the following points:

1. That the reorganization took place after March 3, 1917, or, on March 19, 1917, the date of incorporation of the New York corporation.

2. That the accounts receivable of the Younker Realty Company and the Younker Building Company in the amount of $97,000.00 and $45,000.00 should be eliminated from invested capital.

3. That a tax legally due may be assessed at any time prior to the expiration of the statute.

The claims for refund, abatement and credit of $440.65, $1234.81 and $17,641.19 (a portion of which applies to the years 1917, 1918 and 1919) have been carefully considered in the present audit and will be adjusted in accordance with the findings indicated in the attached schedules.

The business premises used by the petitioner and its predecessor corporation consisted of a five-story corner building, 132 feet square, and a parcel of ground of the same size. This property had previously been leased by Younker Brothers, Inc., from Younker Bros.

Construction Co. at an annual rental of $10,000 for the ground and more than $28,500 for the building and, at January 1, 1917, the remaining term of the lease was seven years. The Commissioner determined that the leasehold had a value of $50,000 for the purpose of exhaustion.

The commercial standing of Younker Brothers, Inc., had been established over more than 50 years of continuous business in the same line at the same place, first as a partnership and later as a corporation. In the years 1916 and 1917 the prospects for further increases in business were good. The business had always been owned and controlled by a few individuals. Since incorporation of the business under the laws of the State of Iowa in 1904 until 1917, the capital stock was closely held and there were no sales of same except between stockholders or to certain persons who had long been employees of the business. All of the stock of the corporation was common stock designated Class "A" and Class "C," the Class " C " stock having no voting rights. The first change in stock ownership by sale occurred in 1912 when Wilchinski purchased a few shares of Class " C " stock. At that time the stockholders conferred together as to the price at which the stock should be sold and it was decided that any stock sold should be upon the basis of the book value at the date of sale plus $75 a share for good will. The price which Wilchinski paid for the shares purchased by him in 1912 was upon this basis. Subsequently he exchanged this Class " C " stock for Class "A" stock share for share and in 1915 purchased an additional 150 shares of Class "A" stock from Ira M. Younker at book value plus $75 a share, the total price paid a share being $196.81.

Later, in 1916, one Burns, then a stockholder, agreed to sell 500 shares of the capital stock of Younker Brothers, Inc., to Joseph S. Zwart at book value plus $75 a share and in January, 1917, Zwart purchased these 500 shares upon that basis and paid therefor $208.07 a share. This stock was surrendered and canceled and 500 shares issued by the Iowa corporation to Zwart on January 15, 1917.

At the time of the consideration and execution of the " Plan and Agreement for Reorganization " on January 15, 1917, the then stockholders of Younker Brothers, Inc., agreed to set aside a portion of their stock interest in the Iowa corporation to be sold to selected employees of the corporation on the basis of the book value plus $75 a share. No stock interests were sold to the employees of the corporation until after the execution of the " Plan and Agreement for Reorganization," but shortly thereafter interim certificates were issued to employees of the Iowa corporation evidencing their right to receive preferred and common stock of the proposed New York corporation if, as, and when issued, for which these employees paid, or agreed to pay, upon the basis of $100 a share for preferred and

$30 a share for common stock of the proposed New York corporation which was arrived at by the stockholders of the Iowa corporation upon what they considered to be the actual value of the tangible and intangible assets of the Iowa corporation. Interim certificates were issued as follows:

| | Shares common, New York corporation | Shares preferred, New York corporation |
|---|---|---|
| Old stockholders, Iowa corporation: | | |
| Norman M. Wilchinski | 1,898 | 792 |
| Aaron Younker | 1,623 | 1,643 |
| Joseph S. Zwart | 1,339 | 269 |
| Herman Younker | 1,240 | 910 |
| Ira M. Younker | 1,000 | 236 |
| A. E. Fletcher | 300 | 150 |
| Employees of old corporation: | | |
| George M. Bennett | 400 | 150 |
| C. T. Gerhardt | 300 | 100 |
| G. T. Everett | 500 | 150 |
| E. C. Wiltsey | 100 | |
| F. P. Fries | 300 | 150 |
| H. A. Metcalfe | 300 | 150 |
| R. E. Jackson | 300 | 150 |
| O. C. Matthess | 150 | |
| G. R. Barlow | 100 | |
| Lyda Bayliss | 50 | |
| T. C. Hopkins | 100 | |
| Jno. Clarkson, Adm | | 150 |

During the years 1912 to 1916, inclusive, the average investment of the Iowa corporation in tangible assets at the beginning of and the average net earnings for each of such years were as follows:

| Year | Tangibles | Net income |
|---|---|---|
| 1912 | $373,500.00 | $131,914.54 |
| 1913 | 403,431.96 | 142,958.73 |
| 1914 | 432,139.85 | 146,910.25 |
| 1915 | 454,972.59 | 174,764.40 |
| 1916 | 474,519.03 | 173,034.97 |
| Average | 427,712.68 | 151,393.32 |

About twenty years ago C. A. Harris, B. D. Harris, and O. D. Estabrook purchased a quarter block at the corner of Walnut and Des Moines Streets, in the City of Des Moines, for $80,000. C. A. Harris afterwards purchased the interests of his coowners. In 1916, Younker Brothers, Inc., offered to pay Harris $325,000 for the property or to take a 99-year lease therefor at a net rental of $15,000 per annum. Negotiations followed in which Harris insisted that the stockholders of Younker Brothers, Inc., personally sign the lease as guarantors of the rent specified therein, which they did not desire to do. Finally, Harris agreed that if the stockholders of Younker Brothers, Inc., would organize a separate corporation with a paid-in cash capital of $100,000, he would execute the lease desired upon the

terms mentioned. Accordingly on February 1, 1916, the Younker Realty Co., an Iowa corporation, was organized with a capital stock of $100,000, and on that date the three Younkers and Wilchinski each paid in to this corporation $25,000 in cash and the capital stock was thereupon issued to them in equal amounts. On February 1, Harris, as lessor, and Younker Realty Co., as lessee, entered into a 99-year lease upon the property mentioned at a net annual rental of $15,000. The Realty Company's only purpose was to be the lessee of the land and the only reason for the stockholders paying in the $100,000 was to afford Harris the security upon which he insisted for the payment of the rental specified in the lease. As soon as this transaction had been completed the stockholders of the Realty Company, desiring to have the use of the money which they had paid in, consulted their attorney as to whether it would be consistent with the lease and the articles of incorporation if they should have the Realty Company loan a portion of the money which they had paid in, to them. The attorney advised them that there would be nothing improper in this, that they would be individually liable to the corporation for the amount borrowed, and that the corporation could call upon them at any time for the money. Accordingly, on February 4, 1917, the Realty Company loaned the four stockholders a total of $85,000 in equal amounts and charged the same to them upon its books. In December, 1917, the four stockholders borrowed an additional $12,000 from the Realty Company in equal proportions. No notes were given to the Realty Company for the amounts and no interest thereon was ever paid. In March, 1923, the stockholders paid back to the Realty Company the total amount of $97,000 borrowed and on March 31, 1923, sold their stock in the corporation for $200,000. In computing the consolidated invested capital for the taxable periods involved, the Commissioner excluded the amount of $97,000 on the ground that it did not represent cash *bona fide* paid in to the Realty Company.

Shortly after the organization of the Realty Company, Younker Brothers, Inc., sought a lease covering certain corner property owned by the Hubbel estate near that covered by the Harris lease. The owner of this property desired security for the payment of the rental agreed upon, and expressed a willingness to execute the lease if a corporation to become lessee were organized with a paid-in cash capital of $50,000. Whereupon the three Younkers and Wilchinski, who were the stockholders of the Realty Company, incorporated the Younker Building Co. under the laws of Iowa on February 12, 1916, and paid in to this corporation for its entire capital stock, in equal proportions, a total of $50,000, whereupon the Hubbel Estate, as lessor and the Younker Building Co. as lessee entered into a lease

for the property in question. Immediately after the $50,000 had been paid in to the corporation for stock each of the four stockholders borrowed $11,250 which was charged to them upon the records of the Younker Building Co. The three Younkers and Wilchinski made it a practice of borrowing from and loaning money to Younker Brothers, Inc., the mercantile concern, from time to time, and the check of Younker Building Co. for $45,000 was made payable to Younker Brothers, Inc., and one-fourth of the amount was credited by Younker Brothers, Inc., upon its books to each of the four stockholders mentioned. No notes were given to the Younker Building Co. for the amount and no interest was ever paid upon the same.

The three Younkers and Wilchinski, constituting the stockholders of the Younker Realty Co. and the Younker Building Co. have at all times been entirely solvent and fully able to pay the amounts due these corporations upon demand.

Upon audit of the consolidated returns for the taxable periods in question the Commissioner excluded from invested capital the amount of $45,000 upon the ground that it had not been *bona fide* paid in for stock.

In determining the consolidated invested capital for the taxable periods, the Commissioner reduced invested capital for 1917 on account of the Federal tax of $3,783.85 of the several affiliated corporations for 1916 and for the taxable year 1918 he reduced invested capital in the amount of $23,735.23 on account of tax for the year 1917 and for 1919 he reduced invested capital in the amount of $33,906.99 on account of tax for the preceding year, 1918.

### OPINION.

LITTLETON: If Commissioner David H. Blair had authority to make a determination in respect of the tax of the petitioner for the periods in question and was correct in determining that the taxpayer, a New York corporation, acquired the business and assets of Younker Brothers, Inc., an Iowa corporation, through a change in ownership subsequent to March 3, 1917, and that the provisions of section 208 of the Revenue Act of 1917 and section 331 of the Revenue Act of 1918 were applicable in the determination of the invested capital, it becomes unnecessary to pass upon the claims advanced by the petitioner as to the actual value of the tangible and intangible assets acquired by it in 1917. We think little discussion is necessary to show that in the circumstances disclosed by the facts in this proceeding Commissioner Blair was not precluded from considering the matter of the tax liability of petitioner and its affiliated corporations

for the periods involved. The petitioner's objection to the Commissioner's authority to consider the matter of its tax liability can relate only to the period March 19, 1917, to December 31, 1917, and for the month of January, 1918, since this is the only period in respect of which the petitioner claims the present Commissioner's predecessor made a determination. The petitioner's objection is predicated entirely upon the letter to Younker Brothers, Inc., dated December 21, 1920, at which time William M. Williams was the Commissioner of Internal Revenue. There is no evidence in the record other than the income-tax return, Form 1031, and the excess-profits-tax return, Form 1103, filed by Younker Brothers, Inc., on or about March 27, 1918, as to what facts or information were before the then Commissioner for forming the basis of his conclusion indicated in the letter of December 21, 1920.

There has been no showing that the true facts and circumstances relating to the reorganization of the Iowa corporation and the change of ownership of the property and business of that corporation to the new corporation upon which Commissioner Blair acted were known to Commissioner Williams and upon this failure of evidence alone we would have to decide that Commissioner Blair was not precluded by law in making a determination in respect of the tax liability. In addition to this, there is no suggestion that the facts relating to the relationship of the five other corporations with Younker Brothers, Inc., were known to the Commissioner's predecessor in office, and the statements contained in the income and profits-tax returns filed by the petitioner do not evidence this fact. These returns stated that the New York corporation was incorporated and organized on January 15, 1917, that the good will claimed by it was acquired for stock on January 15, 1917, that the business was not reorganized or sold, or its ownership changed after March 3, 1917, and that the petitioner was not affiliated with any other corporation. In answer to question 3 on page 4 of the original excess-profits-tax return, the petitioner, in answer to the question " Under the laws of what State or country [it was incorporated] ?" answered " New York, Charter filed March 19, 1917," and it now claims that this statement upon the return precludes the present Commissioner from modifying the determination of his predecessor. Even if there might be a case where a Commissioner might be precluded from modifying his predecessor's determination, or determining a further additional tax within the statutory periods of limitation for years for which the predecessor in office had audited returns, we think the facts in this record are far from presenting such a case. Cf. *Dallas Brass & Copper Co.*, 3 B. T. A. 856; *Warner Sugar Refining Co.*, 4 B. T. A. 5; *Boyne City Lumber Co.*, 7 B. T. A. 36. Compare also, *Carter Music Co.* v. *Bass*, 20 Fed. (2d) 390, wherein the United States District Court for the Southern District of Texas,

held in opinion rendered June 15, 1927, in an action by the tax-payer to recover taxes paid in respect of which the taxpayer and the Commissioner of Internal Revenue had entered into an agreement in respect of the tax liability under and pursuant to section 1312 of the Revenue Act of 1921, which agreement was approved by the Secretary of the Treasury, that the taxpayer was, notwithstanding such agreement, entitled to recover a portion of the tax paid. We have held that the Commissioner is not precluded from reviewing and reversing his predecessor's decision as to a question of law. *Yoko-hama Ki-Ito Kwaisha, Ltd.*, 5 B. T. A. 1248. And that a prede-cessor's determination of a question of fact is not binding upon his successor for a following year. *Boyne City Lumber Co.*, 7 B. T. A. 36. There has been no showing in this proceeding that Commissioner Blair's determination which is complained of was not the result of a reopening of the case by Commissioner Williams after his letter of December 21, 1920. See *Nazareth Cement Co.*, 4 B. T. A. 1121. We are of the opinion that the claim that Commissioner Blair was without legal authority to make a determination in respect of the tax liability of petitioner and its affiliated corporations for the taxable periods involved is without merit.

We think the facts hereinbefore set forth conclusively show that the Commissioner was correct in holding that the provisions of section 208 of the Revenue Act of 1917 and section 331 of the Revenue Act of 1918 were applicable in the determination of the invested capital of the petitioner for the taxable periods involved. It is con-tended upon behalf of the petitioner that for all intents and purposes the New York corporation acquired the business and property of the Iowa corporation on January 15, 1917, and that since this was prior to March 3, 1917, the provisions of the above-mentioned sec-tions do not apply; that if it should be held that the business and properties were acquired by the New York corporation subsequent to March 3, 1917, it acquired such assets from an association composed of the former stockholders and employees of the Iowa corporation, which association was the result of a reorganization on January 15, 1917, and the actual value of the tangible and intangible assets ac-quired by this association from the Iowa corporation on January 15, 1917, should be used in determining this petitioner's invested capital. Section 208 of the Revenue Act of 1917 provides—.

That in case of the reorganization, consolidation or change of ownership of a trade or business after March third, nineteen hundred and seventeen, if an interest or control in such trade or business of fifty per centum or more remains in control of the same persons, corporations, associations, partnerships, or any of them, then in ascertaining the invested capital of the trade or business no asset transferred or received from the prior trade or business shall be allowed a greater value than would have been allowed under this title in computing the invested capital of such prior trade or business if such asset had not been so

transferred or received, unless such asset was paid for specifically as such, in cash or tangible property, and then not to exceed the actual cash or actual cash value of the tangible property paid therefor at the time of such payment.

Section 331 of the Revenue Act of 1918 provides—

In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: *Provided,* That if such previous owner was not a corporation, then the value of any asset so transferred or received shall be taken at its cost of acquisition (at the date when acquired by such previous owner) with proper allowance for depreciation, impairment, betterment or development, but no addition to the original cost shall be made for any charge or expenditure deducted as expense or otherwise on or after March 1, 1913, in computing the net income of such previous owner for purposes of taxation.

A corporation is a taxable entity and, until it comes into existence, it can not acquire or own property, and no one else can hold property in such a way as to make the acquisition or ownership by the corporation, for the purposes of computing invested capital under the taxing acts, antedate the corporate existence. Furthermore, there is no showing in this proceeding that any one other than the Iowa corporation ever held or owned the business or assets of that corporation prior to March 19, 1917, when the New York corporation was created and organized, as was stated in paragraph 2 of its charter "To acquire and take over, as a going concern, the general merchandise business now carried on at Des Moines, Iowa, by Younker Brothers, Inc., and all or any of the assets or liabilities of that business." This provision of the charter also negatives the fact that there was ever any intermediate joint stock association which owned the assets of the Iowa corporation. The Iowa corporation was not dissolved prior to the acquisition of its assets by the New York corporation, it never parted with title to or possession of its assets. Its capital stock, which was owned by the six individuals hereinbefore mentioned, was never surrendered to it or canceled. So far as the evidence shows there was never any distribution by the Iowa corporation of any of its assets in liquidation. The interim certificates which were issued by the Iowa corporation's stockholders to themselves and others evidence nothing more than the right of the holders thereof to receive so many preferred and common shares "of a New York corporation to be organized under the laws of New York, if, as and when issued." The stock of the Iowa corporation, upon the basis of which the interim certificates were issued to the stockholders of record and to employees for whom such stockholders had set aside a portion of their stock, was at all

times held by their attorney. The interim certificates were not stock in any corporation, they gave the holders no title to any of the assets of the Iowa corporation on their own account or for the benefit of anyone else; they evidenced nothing more than an agreement and understanding between the stockholders of the Iowa corporation. No one could have successfully reached the assets of the Iowa corporation by proceeding against the holders of the interim certificates, nor could an action have been successfully maintained by or against the New York corporation in respect thereof prior to March 19, 1917, the date of its creation. The assets in question belonged to the Iowa corporation until there was a change of ownership and acquisition thereof by the New York corporation on or after March 19, 1917. The "Plan and Agreement for Reorganization" of the Iowa corporation did not operate to divest the Iowa corporation of title to any of its assets. The corporation was not a party to the agreement and the language of the whole agreement of January 15, 1917, shows merely that it was an arrangement by the stockholders of the Iowa corporation to organize at some future time a new corporation to acquire and take over the business and assets of the Iowa corporation. The closing of the books of the Iowa corporation and the opening of new books in the name of Younker Brothers, Inc., a New York corporation, on January 15, 1917, was merely "for the purposes of accounting" and could not affect the change of ownership of the property and business of the Iowa corporation for the purpose of computing invested capital under the Revenue Acts. The Iowa corporation was taxable upon the earnings of the business of March 19, 1917, irrespective of the fact that on the latter date the New York corporation took over its property and business as of January 15, 1917. See *Peter W. Rouss*, 4 B. T. A. 516; *Henry F. McCreery*, 4 B. T. A. 967.

Petitioner cites and relies upon the decision of the Board in the *Appeal of Manville Jenckes Co.*, 4 B. T. A. 765, wherein it was held, that cash paid into a corporation by its stockholders with the definite understanding that such money should be at the risk of the business and that stock would subsequently, when authorized, be issued therefor, and for which the corporation in the meantime gave notes, constituted invested capital from the date paid in, but that decision is not authority under the facts in this proceeding for the claim either that there was an association which acquired the assets of the Iowa corporation, or that the New York corporation acquired such assets prior to March 3, 1917.

It is not disputed that ownership of more than 50 per cent of the stock of the New York corporation remained in the stockholders of the Iowa corporation. We affirm the Commissioner's determination that under section 208 of the Revenue Act of 1917 and section 331 of

the Revenue Act of 1918 the petitioner, a New York corporation, can not include in invested capital for the taxable periods in question any of the assets acquired from the Iowa corporation at a greater value than could have been allowed in respect thereof in computing the invested capital of the Iowa corporation.

We are of the opinion that the Commissioner was in error in excluding the amount of $97,000 in computing the invested capital of Younker Realty Co. and the amount of $45,000 in computing the invested capital of Younker Building Co. for the taxable periods involved. These amounts represented cash *bona fide* paid in for stock of these corporations. The stockholders of Younker Brothers, Inc., desired to obtain leases upon certain valuable property for use in expanding the business of Younker Brothers, Inc. In order to obtain such leases it was necessary to organize the two corporations mentioned with a paid-in capital stock of $100,000 and $50,000, respectively. These corporations loaned a portion of the paid-in capital to its four stockholders without interest. This was not a distribution by the corporations in partial liquidation. The stockholders were personally liable at all times for the return of the amounts borrowed. They were at all times solvent and fully able to pay the amounts upon demand.

The action of the Commissioner in reducing invested capital for the taxable periods on account of the tax on the income for the preceding years is approved. Section 1207 of the Revenue Act of 1926; *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

ARUNDELL and MILLIKEN did not participate.