*Decisions will be entered under Rule 155.*

ESTATE OF PAUL L. E. HELLIWELL, DECEASED, MARY JANE MELROSE AND SECURITY TRUST COMPANY, PERSONAL REPRESENTATIVES, AND MARJORIE M. HELLIWELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6004–76.    Filed October 29, 1981.

*Calvin Eisenberg, Donald A. Statland, Robert D. Zimelis, Randall G. Dick,* and *Alan F. Segal,* for the petitioners.

*James F. Kidd* and *Janet A. Engel,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $46,043.74 in the petitioners' Federal income tax for 1972. The sole issue for decision is whether a limited partner in a "motion picture production service partnership" is entitled to deduct any part of the costs paid in 1972 for the production of motion pictures in that year.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Paul L. E. Helliwell and Marjorie M. Helliwell, husband and wife, resided in Coral Gables, Fla., at the time they filed their petition in this case. Mr. and Mrs. Helliwell filed their joint Federal income tax return for 1972 with the Internal Revenue Service. On December 24, 1976, after such petition was filed, Mr. Helliwell died. Subsequently, the Estate of Paul L. E. Helliwell, deceased, Mary Jane Melrose and Security Trust Co., personal representatives, was substituted as a party-petitioner.

On July 1, 1971, Champion Production Co. (Champion) was organized as an Illinois general partnership. Champion's partners were Burton W. Kanter, an attorney, Jerry Weiss, an accountant, and International Cinema, Inc. Champion's stated purpose was to provide production services required for the making of motion pictures. However, Champion did not maintain a production staff. The manner in which Champion proposed to conduct its business was set forth in a letter to the Commissioner, dated July 23, 1971, in which Champion requested a ruling that its use of the cash method of accounting for income tax purposes would be proper and that it could currently deduct the expenses of producing a motion picture. Attached to such ruling request was a proposed production agreement, which, in part, described the services to be performed by Champion:

Contractor [Champion] shall perform all functions necessary to prepare a negative of the Picture based upon the story and photoplay entitled "Chico." Such functions as are to be performed by Contractor hereunder shall include

but shall not be limited to providing the following services: contracting for actors and actresses, doing layout and direction, photography, sound, wardrobe, props and set dressing, background, editing and music, provided, however, that Owner has acquired the aforementioned Total Picture and shall make the same available to Contractor at no cost to Contractor to the extent necessary for Contractor to perform its functions hereunder. It is the intent of the parties that upon completion of Contractor's obligations hereunder, the Picture will be complete and a negative ready for development of prints preparatory for distribution by Owner.

In the motion picture industry, a service company supplies the technical services that independent producers need to make a film, either because such producers lack technical expertise or because they cannot afford to keep a technical staff on a permanent basis.

On December 17, 1971, in response to such ruling request, the Commissioner ruled that Champion could adopt the cash method of accounting, that such method would be considered to clearly reflect income within the meaning of section 1.446–1(a)(2) of the Income Tax Regulations, and that any amounts which were properly deductible under section 162 of the Internal Revenue Code of 1954[1] could be deducted in the year such items were paid. Such ruling provided, in part, that:

According to the information submitted, Champion is a partnership engaged in the business of performing various functions required for the production of a motion picture. Champion contracts with the owners of the rights to produce a motion picture to perform such services as hiring some of the actors, directing the film, photographing the production, editing the film, and handling the financial and budget aspects of making a film. For its services Champion receives a fixed fee payable at various periods during and possibly after the completion of the production of the film. The payment of this fee is not contingent on the success of the completed film. Neither Champion nor any of its partners will own any interest either directly or indirectly in either the rights to make a film or in the completed negative by reason of the services performed by them in producing the film (other than any lien or other interest which may accrue through failure of the owners to make the required payment under the contract). It is also represented that neither Champion nor any of its partners will undertake the production of a film with an intention to acquire an interest in the completed negative.

It is indicated that the primary manner in which Champion will generate its income is through providing a wide range of professional services needed for the development of a negative film ready for duplication of prints. It is

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

also indicated that the primary costs or expenses of generating Champion's income will consist of salaries and wages, interest on loans, editing services and professional fees for services. Thus there will be no substantial investment in physical plant, machinery or other equipment.

Subsequent to the issuance of the December 17, 1971, ruling, Champion abandoned its initial film services project and, through Mr. Kanter, entered into negotiations with John Heyman, a director of World Film Services Ltd. (WFS), a United Kingdom corporation, for the production of four films.

WFS was an established company with a known reputation in the film industry. It was engaged principally in the packaging, developing, and production of motion pictures and primarily derived its revenues from the services it performed. Since 1966, it had produced several successful films including "The Go-Between." The usual manner in which WFS produced films was to obtain a completed script or to acquire a "property" from which it developed a script. It then engaged a production manager who hired the film crew and arranged for the "bricks-and-mortar" aspects of making the film. WFS did not employ technicians on a permanent basis and did not own any equipment needed to produce films. In 1972, WFS was not in a sound financial position—its current liabilities exceeded its current assets. WFS's directors included John Heyman (chairman), Terence Baker, Edward Oldman, Norman Priggen, and Henry Thomas, who was also a lawyer for WFS.

At the time Mr. Kanter was negotiating with WFS, Mr. Heyman was also negotiating with Columbia Pictures (Columbia), Warner Bros., Paramount Pictures Corp. (Paramount), Twentieth Century-Fox Film Corp., Arrow Film, and several television networks concerning the production and distribution of the four contemplated films. One of such films, "Black Gunn," was originally brought to WFS by World Arts Media Film Productions Associates U.K. (World Arts Media) through its controlling director, Robert Hartford Davis. Mr. Davis had previously written the story for "Black Gunn" and requested that WFS act as agent for World Arts Media in obtaining the financing and distribution of such film. WFS hired Franklin Coen to rewrite the screenplay for such film and discussed the film with Paramount and Columbia. Subsequently, in early 1972, Columbia made an offer regarding "Black Gunn." Originally, World Arts Media was to produce the film for WFS

with WFS being responsible for the delivery of the film to Columbia. However, World Arts Media was not able to contribute any of its own funds toward the production of the film, and the preliminary agreement among WFS, Columbia, and World Arts Media did not provide sufficient financing to produce the "quality" of picture desired by WFS and World Arts Media. As a result, WFS entered into negotiations with Champion in order to provide such additional financing.

As a result of his negotiations with WFS, Mr. Kanter concluded that Champion should be reconstituted as a limited partnership. On February 23, 1972, Champion requested a supplemental ruling from the Commissioner; such request provided in part:

> As a result of certain production and financing opportunities recently presented, Champion contemplates reconstituting itself as a limited partnership and entering into a series of agreements with * * * [WFS] to perform certain services for WFS in connection with the production of a group of films for WFS. * * *

The services which Champion was to provide to WFS were essentially the same as those stated in the July 23, 1971, ruling request. Such services were set forth in the tentative production agreement for "Creeping Flesh," one of the four contemplated films, and that agreement was attached to the supplemental ruling request. Such ruling request also set forth that Champion's limited partners were to provide total capital contributions to the partnership of $1,200,000 and that the balance of Champion's financial requirements was to be obtained via a loan from the London branch of the American National Bank & Trust Co. of Chicago (American National). Such loan was to be secured by the distribution contracts which WFS would enter into with the distributors of the films. The contemplated manner of paying Champion for its services was also stated in the supplemental ruling request as follows:

> With respect to the films described herein, in return for providing these services it is presently agreed among the partners that WFS will pay Champion a maximum of $5,750,000 as follows:
>
> (a) within thirty days after completion and delivery of the negative and WFS's acceptance of same, or on January 5, 1973, whichever is later, $2,500,000.
>
> (b) six months after the payment in (a) above, the sum of $500,000.
>
> (c) six months after the payment in (b) above, the sum of $150,000.
>
> (d) every three months after the payment in (c) above in an amount equal

to 25% of all monies received by WFS, subject to certain adjustments for commissions, and agreed upon items, until payment of the full amount of $5,750,000.

On March 15, 1972, Champion received a reply to its supplemental ruling request of February 23, 1972, which provided, in part:

It is indicated that the following representations, which were made in connection with your original request, will continue to be applicable after the effectuation of the above-stated circumstances:

(1) the primary manner in which Champion will generate its income is through providing a wide range of professional services needed for the development of a negative film ready for duplication of prints;

(2) the primary costs or expenses of generating Champion's income will consist of salaries and wages, interest on loans, editing services and professional fees for services;

(3) there will be no substantial investment in physical plant, machinery, or other equipment;

(4) neither Champion nor any of its partners, general or limited, will own any interest either directly or indirectly in a completed negative, nor will they undertake the production of a film with an intention to acquire an interest in a completed negative; and

(5) Champion will maintain its books and records on the cash method and will use only the cash method in all financial statements issued to partners, creditors, etc.

Based on the foregoing facts and representations it is held that the changes in the circumstances of Champion's operations as outlined above will not have an adverse effect on our previous ruling that Champion may adopt the cash receipts and disbursements method of accounting for Federal income tax purposes.

On April 7, 1972, Champion requested an additional ruling that it would be classified as a partnership, as such term is defined in section 7701(a)(2), and that the proceeds of the nonrecourse loans which it was contemplating entering into would constitute an addition to the bases of Champion's partners under section 752. Champion also disclosed that such nonrecourse loans were to be secured by distribution contracts which WFS had entered into with various distributors and that neither Champion nor any of its partners would assume personal responsibility for such loans. However, Champion did not disclose that WFS would be guaranteeing such loans.

On May 11, 1972, the IRS requested additional information regarding the loans contemplated by Champion. On May 17, 1972, Champion replied to such request, stating that:

The parties are presently negotiating loans from the London branch offices of the Bank of America and the American National Bank * * * and, accordingly, the loan agreements have not yet been finalized. However, the loans will be in the aggregate amount of approximately $1,750,000, will bear interest at the rate of 7½% per annum and none of the partners will have personal liability with respect thereto. Such loans will be secured by distribution agreements for the films which have been entered into with Columbia Pictures.

On September 14, 1972, the IRS ruled that Champion would be classified as a partnership and that:

In accordance with section 722 of the Code, the basis of an interest in Champion-LP acquired by a contribution of cash to the partnership will be equal to the amount of cash so contributed. In the case of a liability of Champion-LP, provided that none of the partners has any personal liability with respect to such liability, all partners, including the limited partners, shall be considered as sharing such liability under section 752(c) of the Code in the same proportion as they share in the profits. See section 1.752–1(e) of the regulations.

Champion's articles of limited partnership were executed on April 28, 1972. Champion's stated business purpose was "to carry on the business of providing technical, financial and other services in the production of motion picture films." In July 1972, Mr. Helliwell made a capital contribution to Champion in the amount of $23,750 and received a 2.375-percent interest in the profits and losses of Champion. Prior to Mr. Helliwell's making such investment, he received a document entitled "Summary of Investment Opportunity" prepared by the law firm of Levenfeld, Kanter, Baskes & Lippitz. Such document outlined Champion's proposed transactions with WFS and the tax consequences to potential investors. The document projected that an investment of $95,000 would produce tax deductions of approximately $286,000 in 1972. It pointed out that there are inherent risks in the film industry, but that an investor should receive some return on his investment in subsequent years. However, each film would have to gross in excess of $5 million before an investor would receive a cash distribution in excess of his capital contribution, and a gross of $6 million per film was required in order for Champion to receive the full amount ($3,650,000) of the contract payments from WFS.

In April 1972, Champion entered into a preliminary agreement with WFS to provide production services for two films:

"Black Gunn" and "The Hireling." On May 1, 1972, it entered into a production agreement with WFS, which provided in part:

Contractor [Champion] shall perform all functions necessary to prepare negatives of the Pictures based upon the screenplays presently referred to as "The Hireling" and "Black Gunn". Such functions as are to be performed by Contractor hereunder shall include but shall not be limited to providing the following services: services of actors and actresses, all direction, photography, sound, wardrobe, make-up and hair-dressing, props and set dressing, set construction, set operation expenses, editing and music, provided, however, that Owner [WFS] has acquired the aforementioned Total Pictures and shall make the same available to Contractor at no cost to Contractor to the extent necessary for Contractor to perform its functions hereunder. It is the intent of the parties that upon completion of Contractor's obligations hereunder, the Pictures will be complete and a negative of each ready for development of prints preparatory to distribution by Owner. All of such services to be performed by Contractor hereunder are hereinafter referred to as the "Production Services."

Pursuant to such agreement, Champion was to be paid $3,650,000 for its services, payable as follows:

| Date | Installment amount |
|---|---|
| June 30, 1973 | $600,000 |
| June 30, 1974 | 600,000 |
| Mar. 31, 1975 | 1,500,000 |
| Mar. 31, 1976 | 475,000 |
| Sept. 30, 1976 | 475,000 |

However, the installments due March 31, 1976, and September 30, 1976, were limited to 50 percent of all moneys received by WFS from Columbia, after such minimum guarantees and adjustments for commissions and other items as agreed upon between WFS and Columbia in the distribution agreement between WFS and Columbia. If the amounts due to Champion were not paid in full by September 30, 1976, Champion was entitled to additional installment payments every 6 months, commencing March 31, 1977, until the $3,650,000 due under the contract was paid in full; but such additional installments also were limited to 50 percent of the moneys received by WFS from Columbia after minimum guarantees and adjustments. In addition, WFS obligated itself to pay Champion $150,000 from its general funds.

On May 15, 1972, WFS and Champion agreed to enter into

separate agreements for the production services to be rendered for "Black Gunn" and "The Hireling." On May 24, 1972, WFS entered into a production/distribution agreement with Columbia for the production and distribution of "Black Gunn." Such agreement provided that Columbia would pay $1 million to WFS upon delivery of the picture. Also, such agreement provided that Columbia was entitled to the first $3,500,000 of gross receipts with WFS entitled to 25 percent of gross receipts between $3,500,000 and $4,500,000 and 30 percent of gross receipts thereafter. Two additional conditions of such agreement were that Robert Hartford Davis would be the director of the film and Jim Brown would play the lead role. Previously, World Arts Media had transferred its rights to "Black Gunn" to WFS and had withdrawn as a participant because Columbia requested that WFS be responsible for the delivery of the film and, more importantly, because of the additional financial resources provided by Champion.

Prior to making the production/distribution agreement with Columbia, WFS had entered into negotiations with Bank of America, N.T. & S.A., West End Branch, London (Bank of America), to secure a $1 million loan for the making of "Black Gunn." By letter dated May 17, 1972, the Bank of America set out the terms for the making of such loan. Such terms included the following:

1. We shall receive the full continuing unconditional guarantee of * * * [WFS], the company which has contracted to cause the film to be produced. * * *

2. To support their guarantee, we shall receive an assignment from * * * [WFS] of a negative "pick-up" agreement in a form satisfactory to us of Columbia * * * in the amount of $1,000,000 payable on delivery of the subject film negative on or before December 31, 1972.

*      *      *      *      *      *      *

3. We shall receive a first charge over the film negative.

4. We shall receive an assignment of net Producer's share of world-wide distribution proceeds.

5. Completion guarantee satisfactory to us to be provided by Film Finances Ltd., guaranteeing delivery in accordance with the Columbia * * * agreement.

6. Adequate cover for loan interest as determined by us to be provided for in the loan amount and held in a blocked reserve account during the lifetime of the loan.

7. Film budget and script to be approved by * * * [Bank of America].

8. Production account to be established with a Bank of America branch in, Los Angeles.

9. All documentation to be approved by our legal counsel, Slaughter & May.

Such a financing arrangement is termed a "negative pick-up arrangement."

On May 30, 1972, Henry Thomas, a director of WFS, executed a letter to Columbia, instructing Columbia to pay all proceeds due WFS under the production/distribution agreement of May 24, 1972, to the Bank of America until such time as the bank notified Columbia that all moneys due it under the proposed loan agreement had been paid. The other terms set forth in the letter of the Bank of America dated May 17, 1972, having been complied with, on June 7, 1972, an agreement was entered into among Champion, WFS, and Bank of America for the loan of $1 million. Such agreement provided, in part:

(D) Champion has agreed with World Film to produce and to deliver to World Film the Film in all respects in accordance with the provisions of the Distribution Agreement as subcontractor for World Film and in consideration thereof World Film has agreed to repay all moneys advanced to Champion by the Bank [of America] in connection with the production of the Film and to charge its interest in the Film and the benefit of World Film under the Distribution Agreement as security for its obligation to repay all moneys so advanced to Champion by the Bank for the production of the Film

(E) The Bank has agreed to make an advance to Champion for the production of the Film on the basis that World Film will be liable as principal obligor to repay such advance in accordance with the terms of the said agreement between World Film and Champion Payment of such sums by World Film is to be secured by a charge over the negative of the Film and all that the right title and interest of World Film and Champion in and to the Film and the world wide distribution rights therein including (but without limitation) a charge over the benefit of the Distribution Agreement and the right to receive the sum of U.S. $1,000,000 as the consideration for the Film

\*        \*        \*        \*        \*        \*        \*

Now It Is Hereby Agreed as follows:—

A. PRODUCTION OF FILM BY CHAMPION

1. CHAMPION agrees with World Film to produce and to deliver to World Film the Film in all respects in accordance with the provisions of the Distribution Agreement and to make delivery to World Film on or prior to the 27th day of February 1972 [sic] of all such delivery items which under the terms of the Distribution Agreement have to be delivered by World Film to the Distributor [Columbia]

2. IN consideration of the foregoing World Film agrees with Champion to

procure that the Bank makes available to Champion the finance required for the production of the Film and World Film shall satisfy this obligation by:—

(i) *covenanting* directly with the Bank to repay to the Bank all moneys borrowed by Champion from the Bank for the production of the Film together with all interest costs charges and expenses and other sums accruing due in respect thereof;

(ii) *charging* in favour of the Bank as security for the payment by World Film of the said sum all that the benefit of World Film under the Distribution Agreement including the right to receive the Consideration (as defined in the Distribution Agreement) and all that the interest of World Film in the copyright of the Film the underlying material thereto and the world wide distribution receipts;

(iii) *guaranteeing* in favor of the Bank the performance by Champion of Champion's obligations under the Champion-World Film Agreement (as hereinafter defined)

(iv) *instructing* irrevocably the Distributor to pay the Consideration (as defined in the Distribution Agreement to the Bank)

3. TO the extent that the terms of Clauses 1 and 2 above differ from or extend beyond the terms of an agreement dated the 15th May 1972 and made between Champion and World Film relating to the production of the Film such Clauses shall operate by way of amendment to the said agreement In this agreement the expression "Champion-World Film Agreement" means the agreement constituted by the agreement of the 15th May 1972 as amended by Clauses 1 and 2 above

4. CHAMPION agrees that it will charge any interest it may have in the Film or the underlying material as a charging party as security for payment by World Film in pursuance of the covenant by World Film referred to in Clause 2 above

## B. AGREEMENT BETWEEN WORLD FILM AND BANK

1. AT the request of World Film the Bank agrees to make an advance to Champion for the production of the Film subject to and upon the terms and conditions hereinafter contained

2. IN consideration of the foregoing and in pursuance of the Champion-World Film Agreement World Film covenants to repay to the Bank all moneys borrowed by Champion from the Bank for the production of the Film together with all interests costs charges and expenses and other sums accruing due in respect thereof (including for this purpose moneys due to the Bank under Section E hereof) upon the same becoming due and payable under the terms of this agreement. Such covenant is given by World Film as principal obligor and not by way of guarantee

3. IN pursuance of the Champion-World Film Agreement Bank World Film guarantees in favour of the Bank the production and delivery by Champion of the Film in all respects in accordance with the terms of the Champion-World Film Agreement. Accordingly the obligation of World Film to pay to the Bank a sum as provided under Clause 2 of this Section B shall apply notwithstanding failure by Champion to perform its obligations under the Champion-World Film Agreement.

4. IT is expressly agreed as between the Bank and World Film that World

Film shall not be entitled to withhold payment of moneys covenanted to be paid by World Film to the Bank under Clause 2 of this Section B for any reason or cause whatsoever including without limitation any right of set off or counterclaim which World Film has or may have against Champion and the insolvency or bankruptcy of Champion or any of its partners Accordingly World Film shall be absolutely liable to repay to the Bank any moneys advanced by the Bank for the production of the Film together with interest costs charges expenses and other sums in respect thereof provided that such advance is made by the Bank to Champion For this purpose an advance shall be conclusively deemed to have been made by the Bank to Champion if such advance is credited to an account in the name of Champion in the books of the Bank

5. IT is expressly agreed by the Bank that on the basis that World Film is liable to repay to the Bank all moneys advanced by the Bank for the production of the Film to Champion together with interest costs charges expenses and other sums in respect thereof under the provisions of the Champion-World Film Agreement and Clause 2 of this Section B the Bank shall not bring an action to recover such sums against Champion itself or any of its general or limited partners or seek any remedy against them or any of them (other than by enforcing payment by World Film of the covenanted Indebtedness) PROVIDED THAT the Bank shall notwithstanding the foregoing: —

(i) be entitled to withhold from the amount of any advance made to Champion a sum to be applied by the Bank to an interest reserve account and applied in accordance with the provisions of Section D Clause 3 hereof

(ii) be entitled to apply moneys standing to the credit of Champion with the Bank under Section D Clause 6 hereof towards repayment of moneys advanced by the Bank in accordance with the provisions of Section D Clause 6 hereof

(iii) be entitled to apply revenue from the Film received by the Bank towards repayment of the Loan in the manner provided in Section D Clause 7 hereof

6. IN this agreement the expression the "Covenanted Indebtedness" means all moneys owed by World Film to the Bank under the provisions of Clause 2 of this Section

[Document reproduced literally.]

Such agreement was signed by Henry Thomas, as a director of WFS and, pursuant to a previously granted power of attorney, as attorney-in-fact for Champion. On December 12, 1972, such agreement was retroactively amended to clarify that the bank would have no recourse against Champion or its general or limited partners. Such amendment was also signed by Henry Thomas as attorney-in-fact for Champion and as a director of WFS.

On June 8, 1972, Bank of America disbursed the loan proceeds. An internal memorandum of Bank of America dated

June 12, 1972, discussed the bank's reasons for requiring WFS to become the prime obligor, not merely the guarantor, on the loan and its reasons for not requiring the partners of Champion to assume personal liability for the loan; it said:

The borrower, Champion * * * is a limited partnership formed in the U.S.A. for tax reasons and specifically for this film production. It has been requested by Champion, who is producing the film for World Film Services for subsequent delivery to Columbia * * * that while our loan is taken out in Champion's name we should have no recourse to it in this respect. As it is merely being used for a vehicle in overcoming certain tax problems, Champion does not wish to impose any financial obligations on its general partners. This seems feasible, especially as it has relinquished all rights in the film production, and with our loan being predicated entirely on (a) payment under the agreement between Columbia * * * and World Film Services Ltd. of $1,000,000 assigned to us against delivery of the film negative, (b) delivery of the film negative to be guaranteed by Film Finances Ltd., and (c) a Charge over the film negative and assignment of net producer's share of world wide distribution proceeds. World Film Services assumes the position of our prime obligor.

Furthermore, Champion has no assets or liabilities on its books and our credit exposure is in no way affected by our agreeing to the request of lending monies under this credit on a non-recourse basis to the borrower.

This results in a change in our OCR to the extent that the previous guarantor, World Film Services, Ltd., now serves as a direct obligor.

In its agreement to guarantee the completion of "Black Gunn," Film Finances, Ltd. (Film Finances), stated in part:

8. We acknowledge under the terms of the Bank Loan Agreement the Bank is looking exclusively to W.F.S. for the repayment of monies advanced by you [Bank of America] to the Producer [Champion] under the Bank Loan Agreement and has no remedy against the Producer accordingly in the event of default by ourselves under the Guarantee you shall not be under any obligation to mitigate your damage by pursuing a remedy against the Producer or any of its partners other than W.F.S.

Thus, it was understood that Bank of America was primarily relying on the negative pick-up arrangement with Columbia and WFS's expertise, along with Film Finances' completion guarantee, to insure that the loan would be repaid.

The physical production of a motion picture is a "bricks-and-mortar" job of hiring persons to perform a variety of specialized functions. The producer and associate producer are primarily responsible for putting together the elements necessary to make a motion picture, including hiring of personnel, entering into the necessary contracts, supervising the actual

day-to-day production, and preparing reports. None of the general partners of Champion had experience in the actual production of motion pictures. As a result, Champion ostensibly hired Norman Priggen, who was an employee and director of WFS, as producer for "Black Gunn," and Franklin Coen, who had rewritten the screenplay for "Black Gunn," as associate producer. Also, Eric H. Senat, who was a director of World Arts Media, was hired directly by WFS as an associate producer.

Because Champion did not have a reputation or a credit standing in the film industry, WFS, at the request of the contracting parties, guaranteed several of the major contracts for the production of "Black Gunn." Such contracts included those with Norman Priggen, Robert Hartford Davis (as director), Franklin Coen, Jim Brown (as lead actor), Paramount (for a below-the-line facilities agreement),[2] Cine-Mobile Systems (for production equipment), and Film Guarantor, Inc. (as disbursing agent). Also, some of the contracts for the production of "Black Gunn" were signed on Champion's behalf, pursuant to a previously granted power of attorney, by Edward Sands, who was also an attorney for WFS. Such contracts included those with Robert Hartford Davis, Jim Brown, and Franklin Coen. The contract with Mr. Coen was signed by Mr. Sands both as attorney-in-fact for Champion and as attorney-in-fact for WFS.

During the course of the production of "Black Gunn," financial summary statements, daily progress reports, call sheets, and statements of production costs were forwarded to Mr. Kanter in his capacity as a general partner of Champion. Similar documents were also sent to Bank of America and Film Finances. Also, some of the checks drawn on the production account for "Black Gunn" were signed by Mr. Kanter. On its Federal partnership return for 1972, Champion reported the amount of time devoted to business by its general partners, including Mr. Kanter, as "N/A%."

"Black Gunn" was completed on schedule, and the com-

---

[2]Such contract was signed for Champion by Norman Priggen and was also signed for WFS by Mr. Priggen in his capacity as a director of WFS. Additionally, such contract was signed by Mr. Senat in his capacity as a director of World Arts Media, which also guaranteed such contract.

pleted negative was delivered to Columbia pursuant to the production/distribution agreement. Prior to the date when the loan from Bank of America was scheduled to be repaid, Columbia, pursuant to the production/distribution agreement and the instructions received from WFS, deposited $1 million with Bank of America for credit to the account of WFS. Rather than using such funds to pay the loan with Bank of America, on March 28, 1973, Mr. Kanter arranged to borrow $1 million from the London branch of American National. Pursuant to such loan agreement, Champion "borrowed" $1 million from American National with which to repay Bank of America, and Bank of America assigned its security interest under the June 7, 1972, loan agreement to American National. In addition, Bank of America transferred to American National the $1 million it had received from Columbia and which it had credited to the account of WFS. Such funds were held by American National as security for its loan. In addition to interest charges, American National was paid $10,000 as a nonrefundable service charge. The loan agreement with American National was signed by Henry Thomas as attorney-in-fact for Champion and as a director of WFS. The reason for entering into the loan agreement with American National was that Mr. Kanter believed that Champion would have realized $1 million of income in 1973 if the Bank of America loan had been repaid.

"The Hireling" was a property developed for WFS by Terence Baker. In April 1972, WFS entered into a preliminary agreement with Columbia for the production of "The Hireling." Such agreement was signed by Henry Thomas as a director of WFS. In July 1972, Champion entered into an agreement with WFS for the "loan-out" of the services of Mr. Heyman and Mr. Baker as producers of "The Hireling." Pursuant to such agreement, Mr. Heyman and Mr. Baker agreed to look solely to WFS, and not to Champion, for payment of their compensation and expenses. Mr. Baker was both an employee and a director of WFS and was the working producer for "The Hireling."

On December 20, 1972, WFS executed a production/distribution agreement with Columbia with respect to "The Hireling." Such agreement provided that Columbia would advance $225,000 on the first day of principal photogra-

phy and $225,000 on the last day of principal photography. Also, Columbia agreed to pay to WFS $100,000, less the moneys previously advanced for preproduction work (12,000 pounds sterling), upon delivery of the film.[3] WFS warranted that the budget for the film would not be less than $875,000. Mr. Heyman personally guaranteed the performance of WFS under such agreement.

In a supplemental agreement, Columbia agreed to the creation of a first lien and charge over the film in favor of the London branch of the First National Bank of Chicago (FNBC) and a second lien and charge in favor of Film Finances (the completion guarantor). Also, in such agreement, WFS directed Columbia to pay all moneys due to WFS under the production/distribution agreement, up to $520,000, to FNBC until otherwise directed, and then to Film Finances. Such agreement was signed by Mr. Thomas as a director of WFS.

On December 29, 1972, FNBC sent a letter of intent to Champion expressing its willingness to loan $225,000 to Champion. Such letter was addressed to Champion at the same address as WFS. The terms of the proposed loan were that WFS was to deposit $225,000 with FNBC as security for the loan. FNBC agreed to look only to Champion's interest in "The Hireling" and to WFS for repayment and stated that it would have no recourse against Champion or its individual partners. Such letter of intent was accepted by Champion on January 22, 1973, and was signed on Champion's behalf by Mr. Thomas as attorney-in-fact pursuant to a previously granted power of attorney. On January 5, 1973, FNBC addressed a second letter to Champion stating FNBC's willingness to make a $225,000 loan to Champion on terms identical to those stated in the December 29, 1972, letter. Such letter of intent was accepted by Mr. Thomas as attorney-in-fact for Champion. Such acceptance was dated December 29, 1972. On January 8, 1973, Champion, by Mr. Thomas as attorney-in-fact, executed a promissory note to FNBC in the amount of $225,000. Such note provided for interest at the rate of 7–13/16 percent and was due on July 31, 1973 On January 22, 1973, Champion, by Mr.

---

[3]In consideration of WFS granting Columbia the U.S. and Canadian distribution rights to "The Hireling," such agreement was subsequently amended to provide that Columbia would pay WFS an additional 75,000 pounds sterling on Apr. 13, 1973.

Thomas as attorney-in-fact, executed a second promissory note to FNBC in the amount of $225,000. Such note provided for interest at the rate of 7–7/8 percent and was also due on July 31, 1973. Both notes were paid on their due dates, July 31, 1973.

In the fall of 1972, Champion entered into contracts for the services of Hugh Harlow as production manager, Ben Arbeid as producer, Alan Bridges as director, Robert Shaw as principal actor, and Sarah Miles as principal actress. Except for Mr. Shaw's contract, such contracts were signed on Champion's behalf by Mr. Thomas as attorney-in-fact. Negotiations for Mr. Shaw's services were conducted by Mr. Heyman and Mr. Baker. Negotiations for Sarah Miles' services were conducted by Mr. Heyman prior to Champion's involvement with "The Hireling."

Principal photography for "The Hireling" was begun in late November 1972 and was completed on January 19, 1973. The film was completed and ready for delivery to Columbia in April 1973. "The Hireling" qualified as a British quota film eligible for "Eady" benefits (Government subsidies). For purposes of such qualification, WFS was considered the maker of the film, that is, the party ultimately responsible for its production. During the production of "The Hireling," checks drawn on the production account were signed by the producer and countersigned by a director of WFS. Also, during such period, daily progress reports, call sheets, summary of financing and expenditure statements, and statements of production costs were forwarded to Mr. Kanter in his capacity as a general partner of Champion.

In May 1972 and January 1973, Jerry Weiss, as a general partner of Champion and its accountant, met in London with the production accountants for "Black Gunn" and "The Hireling" as well as with some of the directors of WFS. The purpose of such meetings was for Mr. Weiss to discuss the business aspects of the motion picture industry and the accounting aspects of motion picture productions. In addition, Mr. Weiss reviewed the accounting records that were being maintained by the production accountants.

During 1972, production costs in the amount of $2,300,000 were expended with respect to the production of "Black Gunn" and "The Hireling"; Champion's only dealings with WFS were

in connection with the production of "Black Gunn" and "The Hireling"; Champion has not been involved with the production of any other films. Through 1975, WFS made payments to Champion of $1,600,000. Of such amount, $1,450,000 was applied to the repayment of the bank loans and $150,000, the amount WFS was obligated to pay Champion from its general funds, was returned to Champion's investors on a pro rata basis.[4] To the date of trial, February 1980, WFS made total payments to Champion of $2,100,000; no Champion partner has received cash distributions from Champion in excess of his capital contribution.

On its Federal partnership return of income for 1972, Champion reported interest income of $6,894.84 and total deductions of $2,850,527.01 in connection with the production of "Black Gunn" and "The Hireling," resulting in a reported loss of $2,843,632.17. Included in such deductions were interest expenses of $80,978.61. Such return also showed liabilities as of December 31, 1972, of $2,093,323.93. On its returns for 1973 through 1976, Champion reported the following income:

| Year | Income |
|---|---|
| 1973 | [5] $372,526.12 |
| 1974 | [6] 965,054.68 |
| 1975 | 61,453.47 |
| 1976 | 74,103.23 |

On their Federal income tax return for 1972, Mr. and Mrs. Helliwell reported Mr. Helliwell's pro rata share of Champion's reported loss for 1972, $67,536.

In his notice of deficiency, the Commissioner disallowed the petitioners' claimed loss from Champion to the extent of $65,776.77. Such disallowance resulted from the Commissioner's audit of Champion's 1972 return and his determination that all of Champion's claimed deductions, except for the claimed interest expenses of $80,978.61, were not allowable

---

[4] $75,000 was received by Champion in 1973 and $75,000 in 1974.

[5] On its 1973 return, Champion reported gross receipts of $525,000. Such amount represents $450,000 loan repayment to FNBC and the $75,000 received from WFS.

[6] On its 1974 return, Champion reported gross receipts of $1,075,000. Such amount represents the $1 million loan repayment to American National and the $75,000 received from WFS.

deductions in 1972. In the notice of deficiency, the Commissioner stated three theories for such disallowance:

### A. Loans-Expenses

The partnership loss attributable to production or interest expenses reported by the partnership has been disallowed because it has been established that the partnership in substance incurred any expenses or liabilities for which it was not paid or reimbursed, furthermore, the purported loans received by the partnership do not constitute Bona Fide loans to the partnership but rather represent income.

### B. Capitalization

Furthermore, the partnership loss attributable to the expenses for the production of the movie "The Hireling and Black Gunn" [sic] reported by the partnership as ordinary and necessary business expenses has been disallowed because it has been determined that such expenses should be capitalized.

### C. Joint Venture

Furthermore, it has been determined that the partnership is engaged in a joint venture World Wide Services, Ltd. for the creation, development and distribution of the movie "The Hireling and Black Gunn" [sic].

## OPINION

The sole issue for decision is whether the petitioners are entitled to deduct Mr. Helliwell's pro rata share of the loss reported by Champion for 1972. The resolution of such issue requires that we determine whether Champion properly deducted in 1972 the expenses of producing the films paid during such year or whether such expenses should have been capitalized, and whether Champion's partners can include in their bases their pro rata share of the Bank of America and FNBC loans. However, such issues are subordinate to the question of what was Champion's role in producing the films. The petitioners contend that Champion was a viable business entity which actually produced the films pursuant to its production agreement with WFS. The Commissioner, on the other hand, argues that WFS, and not Champion, was the actual producer of the films and that Champion's sole business function was to provide additional financing for WFS. After a thorough review of the record, we are convinced that Champion's sole function was to provide additional financing for WFS and that, in substance, Champion merely purchased a net-profits interest in the films.

The concept of the motion picture production service part-

nership was developed as a means of providing financing for the large "up-front" costs of producing a film by subsidizing such a venture through a hoped-for immediate write-off of the costs of producing a film. It was contemplated that such tax benefits would be augmented through the use of nonrecourse loans, thereby allowing a limited partner to increase his basis and, thus, the amount of losses he could currently deduct. See secs. 704(d), 705, 722, 752(a); sec. 1.752–1(e), Income Tax Regs.[7] Such loans would be secured by the distribution contract which the owner of the film rights would have arranged with a distributor. As compensation for its services, the service partnership would be paid a fee, which would be payable in installments, and which, at least in part, would be contingent on the commercial success of the film. Thus, the hoped-for tax benefits would come through the large "up-front" deduction of the film's expenses, a deferral of the recognition of income, and if the film was a commercial success, a profit to the investors. See generally Kanter & Eisenberg, "What Alice Sees Through the Looking Glass When Movieland Seeks Creative Techniques for Financing Films," 53 Taxes 94, 99–102 (1975); S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 109–117.

In theory, the production service partnership could be a valid business arrangement. However, as in the case of any business arrangement, it must be scrutinized to ascertain whether its form comports with economic reality. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Weiss v. Stearn*, 265 U.S. 242 (1924). The structure of the arrangements reflects exceptional ingenuity and imagination, but as a court, we must not be beguiled by such ingenuity—we must pursue the "paper chase" to ferret out the substance of the arrangements to determine the proper tax treatment. *United States v. General Geophysical Co.*, 296 F.2d 86, 87 (5th Cir. 1961), cert. denied 369 U.S. 849 (1962).

In the landmark case of *Gregory v. Helvering, supra,* the Supreme Court established what has come to be known as the "business purpose doctrine" in evaluating the tax conse-

---

[7]The concept of the production service partnership was developed prior to the enactment of sec. 280, which generally requires the capitalization of the cost of producing a film, and sec. 465, the so-called "at-risk rules." See also sec. 704(d).

quences of a transaction. Although *Gregory* and its progeny have generated much controversy over the years,[8] courts have followed its lead and have focused on the "reality" of a transaction for tax purposes as opposed to its mere form. Indeed, "it is hard to see how an Internal Revenue Code can be successfully applied in the modern world without the safeguards afforded by the *Gregory* doctrine and its various facets." 2 S. Surrey, W. Warren, P. McDaniel & H. Ault, Federal Income Taxation, ch. 9, sec. 3, p. 678 (2d ed. 1980).

In *Gregory*, the Supreme Court refused to give effect to corporate transactions on the ground that, although such transactions complied precisely with the formal requirements for nontaxable corporate reorganizations, such transactions served no function other than that of a contrivance to bail out corporate earnings for the sole shareholder at capital gains rates. Likewise, in *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938), the Supreme Court disregarded for tax purposes a distribution of corporate funds to shareholders which it found to be "a meaningless and unnecessary incident" and which was "so transparently artificial that further discussion would be a needless waste of time." In *Commissioner v. Court Holding Co.*, *supra*, the Supreme Court taxed a corporation on the gain from the sale of property, notwithstanding that the property was transferred to the corporation's two shareholders before the sale, since the Court found that the transfer was made solely to obtain more favorable tax treatment for a sale, which, in reality, was made by the corporation. Similarly, in *United States v. General Geophysical Co.*, *supra*, the Court of Appeals for the Fifth Circuit held that when a corporation transferred depreciable assets to its major shareholders in redemption of their stock and, on the same day, reacquired such assets from such shareholders in exchange for notes of the corporation, the corporation never terminated its control and ownership of such assets, and that the reacquisition of such assets did not result in a step-up of the basis of such assets. In commenting on the application of the business purpose doctrine to such transaction, Judge

---

[8]As Randolph Paul stated, "Few cases have been the subject of such violent disagreement and confusion as the *Gregory* case. The case is all things to all men." R. Paul, Studies in Federal Taxation 125–126 (3d Series 1940). Fn. refs. omitted.

Wisdom stated: "These tax avoidance implications do not constitute a license to courts to distort the laws or to write in new provisions; they do mean that we should guard against giving force to a purported transfer which gives off [for tax purposes] an unmistakably hollow sound when it is tapped." 296 F.2d at 89. In *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965), cert. denied 385 U.S. 1005 (1967), the taxpayer, in the year in which she won the Irish Sweepstakes, borrowed money to purchase Government securities. The loans, which were fully collateralized by such securities, required the taxpayer to pay a rate of interest which exceeded the interest rate of such securities. The Court of Appeals acknowledged that the transactions were not "shams"; nevertheless, the court held that the interest payments were not deductible because the loan transactions had no "purpose, substance, or utility apart from their anticipated tax consequences." 364 F.2d at 740. See also *Knetsch v. United States*, 364 U.S. 361 (1960); *Higgins v. Smith*, 308 U.S. 473 (1940).

To understand Champion's relationship to WFS and the reality of its role with respect to the films, it is necessary to examine the circumstances under which Champion became involved with WFS. WFS was an established company with a well-known reputation in the film industry. Its manner of operation was to develop a script and then hire a production manager who arranged for the technical "bricks-and-mortar" aspects of actually producing the film. Thus, WFS was a packager and developer of films and furnished supervisory services for their production. Champion, on the other hand, was not an experienced organization. Other than "Black Gunn" and "The Hireling," Champion has not been involved in the production of any other films, and none of Champion's general partners had previous experience in the actual production of a film. At the time of the agreement, it employed no technicians, owned no equipment, and was completely unprepared to furnish the "bricks-and-mortar" production services needed by WFS.

During 1972, WFS was in poor financial condition. It had been approached by World Arts Media, through Robert Hartford Davis, to obtain financing and a distributor for "Black Gunn." WFS was able to negotiate a preliminary

distribution contract with Columbia for "Black Gunn." However, World Arts Media was unable to contribute funds for the production of the film, and the commercial financing which could be obtained by use of a negative pick-up arrangement with the contract as security was insufficient to produce the "quality" of picture that WFS and World Arts Media desired. If additional financing could be obtained, the "quality" of the picture, and thereby its potential for commercial success, could be increased. As a result, WFS entered into a contract with Champion for Champion to produce "Black Gunn" and "The Hireling."

Mr. Heyman testified that there were two reasons why WFS contracted with Champion to produce the films: (1) Because Champion could provide the necessary production services, it relieved Mr. Heyman and other WFS personnel of the responsibility of supervising the production of the films and thereby allowed WFS to make other films; and (2) because Champion provided the extra financial resources necessary for WFS to make a better-quality picture and thereby increase the possibility of larger profits. With respect to the second stated reason, we believe that Mr. Heyman has aptly characterized Champion's role. However, the record contradicts his first reason for contracting with Champion.

The record clearly shows that Champion's presence freed up none of the time of Mr. Heyman or the other WFS directors and personnel. The producer of "Black Gunn," the person responsible for the "bricks-and-mortar" aspects of the film, was Norman Priggen, an employee and director of WFS. The director of "Black Gunn" was Robert Hartford Davis, the person who brought such film to WFS and whose services were expressly required by the terms of the production/distribution agreement with Columbia. Also, the associate producer of such film, Eric H. Senat, who was a director of World Arts Media, was hired directly by WFS, and the other associate producer, Franklin Coen, was the person hired by WFS to rewrite the screenplay for "Black Gunn." Likewise, the producers of "The Hireling," Mr. Heyman and Mr. Baker, were employees and directors of WFS. In addition, most of the major contracts for the films were negotiated and guaranteed by WFS, including those of Mr. Priggen, Mr. Heyman, and Mr. Baker. Moreover, virtually all the contracts signed for Champion were in fact

signed by persons who were either directors or employees of WFS or agents hired by WFS.

The facts with respect to the loans by the Bank of America and FNBC provide additional insight into Champion's role in the production of "Black Gunn" and "The Hireling."[9] The Bank of America loan was negotiated by WFS. The terms of the loan agreement provided that Champion was to act as subcontractor for WFS and that, at the request of WFS, Bank of America agreed to advance funds to Champion. However, WFS completely guaranteed Champion's obligation to produce the film, and in form as well as in substance, WFS was the principal obligor, not the guarantor, of the loan. Thus, although the form of the transaction was that WFS borrowed $1 million from Bank of America and ostensibly allowed Champion to utilize such funds for the making of "Black Gunn," it is clear that such funds were really used by WFS to produce the film.

Even more indicative of the fact that WFS, and not Champion, was the actual borrower of the funds from Bank of America are the facts with respect to the rollover of such loan. Prior to the loan of the Bank of America becoming due, such loan was repaid by funds obtained from American National. However, the American National loan was fully secured by the $1 million received by Bank of America for the credit of WFS and transferred to American National. Thus, although the American National loan was, in form, made to Champion, it was made solely on the basis of its being 100-percent collateralized by funds belonging to WFS. Hence, in reality, it was WFS, and not Champion, which was the true borrower of such loan. See *Goldstein v. Commissioner, supra.*

The facts with respect to the FNBC loans provide even a clearer view of the charade which WFS and Champion went through to obtain the hoped-for tax benefits for the partners of

---

[9]The record discloses that the FNBC loans were not entered into until January 1973, the date the promissory notes were executed. The petitioners contend that during 1972, there existed an overdraft account with FNBC on which Champion had borrowed funds. In support of such contention, the petitioners introduced an accountant's cost ledger prepared as of the end of 1972. Such ledger showed production loans of 256,398 pounds sterling and 42 pence. There is no explanation of the source of such loans, and we find such ledger to be insufficient to carry the petitioner's burden of proof if we were to address the issue of whether Champion's partners can include such "loans" in their bases.

Champion. Under its agreement with Columbia, WFS was to be paid $225,000 on the first day of principal photography of "The Hireling" and $225,000 on the last day of principal photography. In November 1972, such principal photography began, and principal photography was completed on January 19, 1973. On January 8, 1973, FNBC loaned $225,000 to Champion, which loan was secured by a deposit with FNBC of $225,000 of funds belonging to WFS. On January 22, 1973, 3 days after principal photography was completed, FNBC loaned an additional $225,000 to Champion on like terms. We presume, and the petitioners have offered no evidence to the contrary, that Columbia complied with its agreement to advance funds to WFS. Thus, it is clear that the loans by FNBC were simply a "swapping" of the funds which WFS had previously obtained pursuant to its contract with Columbia. Hence, such loans added nothing to the production of the film and were merely an attempt to provide Champion's partners with an increase in their bases. An analysis of these circumstances reveals that, despite the form of such loans, it is clear that WFS, and not Champion, was the true borrower of such loans. See *Goldstein v. Commissioner, supra*; *Goodstein v. Commissioner*, 267 F.2d 127 (1st Cir. 1959), affg. 30 T.C. 1178 (1958).

What is more, under its production agreement with WFS, Champion was to be paid nothing in 1972 and only $600,000 in 1973. The Bank of America loan, $1 million, was due on March 31, 1973, and the FNBC loans, $450,000, were due on July 31, 1973. Champion's only cash assets were the capital contributions received from its partners, and these funds were presumably used during 1972 in the production of "Black Gunn" and "The Hireling." Thus, Champion clearly had insufficient funds to repay such loans timely.[10] However, such loans were repaid: the Bank of America loan was rolled over to American National, and the new loan was secured by WFS funds; the FNBC loans were satisfied by application of the funds put up

[10]In their reply brief, the petitioners contend that the production agreement was amended by a later and more specific agreement which required WFS to make payments to Champion as they were needed to repay the indebtedness. Such agreement, if it existed, was not introduced into evidence. Therefore, we cannot conclude that the prior agreement was amended as the petitioners contend.

as collateral by WFS. Thus, WFS, and not Champion, was the real party to such transactions.

The petitioners argue that the Commissioner has recognized that the Bank of America and FNBC loans were liabilities of Champion, since in 1972, he allowed Champion a deduction for the interest paid on such loans. See *Knetsch v. United States, supra*; *Rushing v. Commissioner*, 58 T.C. 996 (1972). The Commissioner has not explained why he allowed such interest deductions. However, in the notice of deficiency, at trial, and in his brief, he has consistently maintained that the loans were not a liability of Champion. Thus, despite the fact that the Commissioner allowed the interest deductions, the petitioners were fully apprised of the Commissioner's position and have not shown that they relied to their detriment on such allowance. Therefore, such allowance does not estop the Commissioner from challenging the substance of the underlying transactions and now maintaining that the liabilities were not incurred by Champion. See *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957); *Younker Bros., Inc. v. Commissioner*, 8 B.T.A. 333 (1927).

Similarly, the petitioners argue that the private letter ruling issued by the Commissioner on September 14, 1972, which ruling has never been revoked, modified, or rescinded, specifically allowed Champion's limited partners to include in their bases their pro rata share of Champion's nonrecourse indebtedness. However, while such ruling did allow for such treatment of nonrecourse indebtedness, it only allowed such treatment with respect to "a liability of Champion-LP." As we have found that, in reality, the bank loans were not those of Champion, such ruling is of no help to the petitioners.

The petitioners contend that Champion's general partners were actively engaged in the production of the films. In support of such contention, they point to the fact that Mr. Kanter signed the WFS-Champion production agreement and to Mr. Kanter's testimony, where he stated that he had frequent conversations with Mr. Heyman concerning the production of the films and that he received financial summary statements, daily progress reports, call sheets, and statements of production costs. However, there is no showing that Mr. Kanter's discussions with Mr. Heyman concerned the technical problems of producing the films. His discussions and

his receipt of the reports—the same reports sent to the banks and completion guarantor—may have reflected the fact merely that he and his associates had made a substantial investment in the production of the films, and that they were anxiously watching the progress of their investment. Also, Mr. Weiss' discussions with the production accountants for "Black Gunn" and "The Hireling" and his meetings with some of the directors of WFS did not rise to the level of active participation in the production of such films. Mr. Weiss testified that one of the purposes for such meetings was to discuss the business aspects of the motion picture industry and the accounting aspects of motion picture productions. The implication of such testimony is that Mr. Weiss was not previously acquainted with such practices. In addition, his review of the accounting records for the films is wholly consistent with an investor watching over his investment. Finally, on its 1972 return, Champion reported the amount of time devoted to business by its general partners, including both Mr. Kanter and Mr. Weiss, as "N/A%."

In short, a meticulous and tedious review of the evidence reveals that, although in form Champion produced the films, in reality, WFS was the actual producer of the films and, except for the infusion of capital provided by the limited partners of Champion, was in no different position than if it had produced the films itself. The sole "purpose, substance, or utility" for WFS's contracting with Champion was for WFS to obtain a relatively inexpensive source of financing in exchange for a hoped-for shifting of tax benefits to the limited partners of Champion. See *Goldstein v. Commissioner, supra.* When "tapped," such arrangement gives off an "unmistakably hollow sound" and will not be recognized for tax purposes. See *United States v. General Geophysical Co., supra.* As stated in *Minnesota Tea Co. v. Helvering,* 302 U.S. at 613, "A given result at the end of a straight path is not made a different result because reached by following a devious path."

The substance of the transactions which Champion entered into with WFS was unlike those where investors combine with the owner of an artistic property to produce such property as a play or motion picture. Such an arrangement usually takes the form of a limited partnership, with the owner of the artistic property as general partner and the investors as

limited partners, or a joint venture, with the owner of the artistic property as one co-venturer and a partnership composed of the investors as the other coventurer. If so structured, any deductions (and income) would be divided among the partners/coventurers and, since both partners/coventurers would have an ownership interest in the artistic property, the cost of producing such property would most likely have to be capitalized[11] and recovered through depreciation. Secs. 1.263(a)–1, 1.263(a)–2(b), Income Tax Regs. However, from the standpoint of an investor seeking large "up-front" tax benefits, such arrangements have obvious drawbacks. It was such drawbacks that the production service partnership technique was "designed" to avoid. Had Champion actually produced the films for WFS, it might have achieved the desired result.[12] But as Alice discovered, things are not always as they appear, and ours must be a trip not through the tangled paths of Wonderland, but through reality.[13]

Having concluded that WFS, and not Champion, was the actual producer of "Black Gunn" and "The Hireling," it follows that the partners of Champion are not entitled to deduct the expenses paid in 1972 for the production of the films. In form, the production agreement provided that WFS was required to make certain fixed payments to Champion on the completion of the films and to make additional payments to Champion if the proceeds from the distribution of the films exceeded certain limits, but there was a ceiling on the amounts that could be received by Champion. Thus, as a result of the capital furnished by Champion, it acquired a right to share in the profits, if any, from the production and distribution of the films up to a maximum amount. In effect, Champion acquired a limited net-profits interest in the films. No income was received by Champion in the year before us, and the parties have not presented their views of how any such income should

[11]The petitioners argue, and we agree, that Champion was not engaged in a joint venture with WFS. See *Commissioner v. Culbertson*, 337 U.S. 733 (1949); *Bryant v. Commissioner*, 399 F.2d 800 (5th Cir. 1968), affg. 46 T.C. 848 (1966); *Luna v. Commissioner*, 42 T.C. 1067 (1964).

[12]As we have found that WFS, and not Champion, produced the films, we need not address the issue of whether Champion was required to capitalize the cost of producing the films and the effect of the rulings issued by the Commissioner on such issue.

[13]See L. Carroll, Through the Looking-Glass (MacMillan & Co., New York, 1892).

be reported; accordingly, we express no views on whether the partners of Champion would be entitled to recover their bases first or whether they would be required to use an income forecast method.

*Decision will be entered for the respondent.*